## SHAW *v.* KELLOGG.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 154. Submitted February 28, 1898. — Decided May 2, 1898.

In 1860 Congress granted a quantity of land in New Mexico, in fulfilment of a grant of non-mineral lands made by Mexico before its transfer, the land to be selected by the grantees, and the surveyor general to survey and locate the land selected, and thus determine whether it was such as the grantees might select. The grantees made their selection, and after considerable correspondence as to the forms of the application and as to the evidence that the selected lands were not mineral lands, the surveyor general, under the direction of the Land Department, approved the selection, and made the survey and location. The Land Department approved the survey, field notes and plat, and the parties were notified thereof, but no patent was issued, as Congress had not provided for such issue. The Land Department noted on its maps that this tract had been segregated from the public domain, and had become private property, and so reported to Congress, and that body never questioned the validity of its action. The grantees entered into possession, fenced the tract, and paid all taxes assessed upon it as private property by the State. *Held,* that the action taken by the Land Department was a finality, and that the title passed, all having been done which was prescribed by the statute.

Such approval entered upon the plat in the Land Department by the surveyor general, under the directions of that department, was in terms "subject to the conditions and provisions of section 6 of the act of Congress, approved June 21, 1860." *Held,* that such limitation was beyond the power of executive officers to impose.

THIS was an action of ejectment brought in the Circuit Court of the United States for the District of Colorado on July 3, 1893, to recover possession of a certain tract in Saguache County, in the State of Colorado, described as follows:

"Section twenty-two (22), township one (1) north, one (1) east, according to the plat of said Baca Grant No. 4, as filed and recorded in the office of the county clerk and recorder of said Saguache County, and including in said section twenty-two certain mineral bearing property designated by the defendant as the Eastern Star Mine, with other mining lands adjacent thereto within said section twenty-two."

After answer a trial was had before a jury, which resulted in a verdict under instructions of the judge for defendant. Upon this verdict judgment was entered, May 22, 1895. Thereupon the plaintiff sued out a writ of error from the Circuit Court of Appeals for the Eighth Circuit. On March 30, 1896, that court certified certain questions. Upon an examination of those questions and after argument of counsel, this court, on December 22, 1897, ordered a certiorari to bring up the entire record, and upon such entire record the case was submitted for consideration.

The premises in question are within the limits of the so called Baca Grant No. 4. The plaintiff is the owner of that grant, and the question presented is as to the validity and extent of his title. Prior to the treaty of Guadalupe Hidalgo between Mexico and the United States of date February 2, 1848, by which New Mexico and other territory in the southwest was ceded to this Government, Mexico had made some quite extensive grants of tracts of land within the territory ceded. Since then Congress has provided for the several portions of the ceded territory different modes of determining the validity and extent of those grants. By the act of July 22, 1854, c. 103, 10 Stat. 308, the office of surveyor general for the Territory of New Mexico was created, and, by section 8, it was made his duty to examine into all claims for lands within the limits of that Territory and to make full report thereof to Congress. In pursuance of this authority the surveyor general examined and reported upon various claims, and

on June 21, 1860, Congress passed an act, c. 167, 12 Stat. 71, confirming several of them. There were two opposing claimants for a large tract of land in the vicinity of the town of Las Vegas. In settling the dispute between them Congress enacted, in section 6:

"SEC. 6. *And be it further enacted*, That it shall be lawful for the heirs of Luis Maria Baca, who make claim to the said tract of land as is claimed by the town of Las Begas [Vegas], to select instead of the land claimed by them, an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in square bodies, not exceeding five in number. And it shall be the duty of the surveyor general of New Mexico to make survey and location of the lands so selected by said heirs of Baca when thereunto required by them: *Provided, however*, that the right hereby granted to said heirs of Baca shall continue in force during three years from the passage of this act, and no longer."

On July 26, 1860, a letter of instructions was issued by the Land Department to the surveyor general of New Mexico in reference to these private land claims. In that letter, after directing a survey of the Las Vegas grant, and a determination of the area thereof, the instructions were as follows:

"The exact area of the Las Vegas town tract having been thus ascertained, the right will accrue to the Baca claimants to select a quantity equal to the area of the town tract elsewhere in New Mexico of vacant land, not mineral, in square bodies not exceeding five in number.

"You will furnish them with a certificate, transmitting at the same time a duplicate to this office, of their right and the area they are to select in five square parcels. Should they select in square forms according to the existing line of the public surveys, the matter may be properly disposed of by their application duly endorsed and signed with your certificate designating the parts selected by legal divisions or subdivisions, and so selected as to form five separate bodies in square form. Then the certificate thus endorsed is to be noted on the records of the register and receiver at Santa Fé, and sent on here by those officers for approval. Should the Baca

claimants select outside of the existing surveys, they must give such distinct descriptions and connection with natural objects in their applications to be filed in your office, as will enable the deputy surveyor when he may reach the vicinity of such selections in the regular progress of the surveys, to have the selections adjusted as near as may be to the lines of the public surveys, which may hereafter be established in the region of those selections.

" In either case the final condition of the certificate to this office, must be accompanied by a statement from yourself and register and receiver that the land is vacant and not mineral."

The survey made of the grant to the town of Las Vegas showed an acreage of 496,446.96 acres, a certificate of which fact was given to the heirs of said Baca.

On December 12, 1862, the following selection was filed with the surveyor general of New Mexico:

"SANTA FÉ, NEW MEXICO, *Dec.* 12, 1862.
"To Surveyor General JOHN A. CLARK, surveyor general of New Mexico:

" I, John S. Watts, attorney of the heirs of Luis Maria Baca, have this day selected, as one of the five locations belonging to the said heirs under the sixth section of the act of Congress approved June 21, 1860, a tract of land in the Territory of New Mexico, described as follows:

" Beginning at a point on the eastern edge of the valley of San Luis, where the thirty-eighth parallel of north latitude crosses the base of the snowy range, dividing the waters of the rivers Arkansas and Del Norte; thence east along said parallel, four and one half miles; thence south along a meridian line twelve miles, thirty-six (chains) and forty-four links distance; thence west at a right angle twelve miles, thirty-six chains and forty-four links distance; thence north to the said specified parallel of latitude; thence east with said parallel to the place of beginning.

" I further state that the said land is entirely vacant, not claimed by any one, is not mineral, but located for purposes

of arable and pastoral agriculture, and is within the limits of the Territory of New Mexico as established in the organic act. I hereby accordingly make application for the survey and location of the tract of land in accordance with the provisions of the above act of Congress.

"JOHN S. WATTS,
"*Attorney for Heirs of Luis Maria Baca.*"

Prior to this time the Territory of Colorado had been organized and a portion of the Territory of New Mexico included within its boundaries, and the land described in this application was within the territory thus included in Colorado. The surveyor general of New Mexico, on the receipt of this application, forwarded it to the Land Department at Washington, and also transmitted a copy to the surveyor general of Colorado. The surveyor general of Colorado, writing on February 24, 1863, to the Land Department, informed it of the receipt of the copy above referred to, and at the close of his letter made this statement: .

"I suppose this selection has been made by ex-Governor Gilpin, as he told me last summer he was in possession of one of the Baca 'floats,' and should locate it as this is located, for the reason that, in his opinion, it would cover rich minerals in the mountains."

In reply the Land Department, on March 13, 1863, wrote as follows:

"It is necessary before the application can be approved by this office, that it be accompanied by the certificates of the surveyor general and the register and receiver that the land selected *is vacant and not mineral*. This is in accordance with our instructions to the surveyor general of New Mexico, extracts from which were furnished your office in our communication of June 7, 1862; especially should the character of the location as to minerals be carefully ascertained after the important statement of ex-Governor Gilpin, which you communicated in your official letter to this office. Whenever you shall acquire good and satisfactory information that the lands included in this selection are vacant and not mineral, to enable

you to do so, you will transmit to this office your official certificate setting forth these facts.

"You will also correspond with the register and receiver of Colorado, when they enter upon their official duties, communicating to them the substance of this communication, and call upon them to furnish their certificate, when able, under the same conditions that your own is to be furnished under, which when received you will forward to this office."

During the year 1863 ex-Governor Gilpin, who had become the owner, or at least interested in this location, made application to the surveyor general of Colorado for a survey of the tract. As the land was beyond the limits of the public surveys then completed, the surveyor general made a contract with deputy surveyor A. Z. Sheldon for its survey, and forwarded the same to the Land Department for approval. On November 2, 1863, that office wrote to the surveyor general disapproving of the contract, and adding:

"In your letter dated the 10th March last transmitting the application of the attorney of said heirs for the location of this claim, you say, ' I suppose this selection has been made by ex-Governor Gilpin, as he told me last summer he was in possession of one of the Baca floats, and should locate it as this is located, for the reason that, in his opinion *it would cover rich minerals* in the mountains.'

"Upon the receipt of your letter you were expressly informed, under date of the 13th March, 1863, that before the application could be approved it must be accompanied by the certificates of the surveyor general and the register and receiver that the land is *vacant and not mineral*, and I then took occasion to communicate the following explicit instructions: ' Especially should the character of the locations as to minerals be carefully ascertained after the important statement of ex-Governor Gilpin, which you communicated in your official letter to this office. Whenever you shall acquire good and satisfactory information that the lands included in the selection are vacant and not mineral, to enable you to do so, you will transmit to this office your official certificate setting forth these facts.'

"In our communication of the 7th June, 1862, you were also furnished with extracts from our instructions to the surveyor general of New Mexico, referring to the location of these claims, in which it was plainly indicated that should selections be made outside of the existing surveys, the survey thereof must be postponed until the vicinity is reached by the regular progress of the public surveys. You will be guided in your official acts by our instructions, which are full and explicit, in relation to the location of the claims referred to. The contract and instructions for the survey of the above mentioned claim are herewith returned."

On December 12 the surveyor general wrote to the Land Office a letter containing this statement:

"SIR: I have the honor to acknowledge the receipt of your letter of the 2d of November last disapproving of the contract for the survey of Grant No. 4 of the floats belonging to the heirs of Luis Maria Baca.

"I herewith transmit my certificate that the lands are 'not mineral and are vacant.' You refer to a letter of the former surveyor general of this district, in which he says that he supposes that this location was made by Mr. Gilpin 'for the reason that in his opinion it would cover rich mineral lands.' I do not believe that at the time Mr. Case wrote that letter he had the least idea that the float as located covered any mineral lands. I have signed the accompanying certificate partly from my own knowledge of the country, but mostly for the following reasons:

"1st. The discoveries of gold thus far go to show that the gold lands of Colorado commence at the base of Long's Peak and extend in a course about 30° west of south to the headwaters of the San Juan, covering a belt of country about 30 miles in width of which the line indicated will be near the western boundary; outside of this no gold or silver lodes have been discovered.

"2d. The grant is located on the great line of travel between Denver and Santa Fé, and thousands of experienced miners have been travelling over the Sangre de Christo and Mosca passes and have found no gold or other valuable minerals.

" 3d. In the summer of 1860 a party of one hundred and fifty miners from here under one Roeder went to the San Luis valley and prospected the whole of the Sangre de Christo range, but found no gold anywhere on the eastern run of the park. Many of the men who were in this expedition have been in my employ, and from them I have had this history of the expedition.

" Such are the grounds on which I have signed the certificate, and to me they are satisfactory."

He enclosed in it certificates of himself and the register and receiver of the local land office in the following language:

" DENVER, C. T., *December* 5, 1863.

" SIR: This is to certify that from good and sufficient evidence I am perfectly satisfied that the land on which the heirs of Luis Maria Baca have located their Grant No. 4, in the San Luis valley, and marked out by a survey made by Albinus Z. Sheldon in November, 1863, is not mineral and is vacant.

" Very truly, your ob't servant,        JOHN PIERCE,
        " *Surveyor General of Colorado and Utah.*"

" COLORADO TERRITORY, GOLDEN CITY, *December* 5, 1863.

" SIR: This is to certify that from good and sufficient evidence we are perfectly satisfied that the land on which the heirs of Luis Maria Baca have located their Grant No. 4, in the San Luis valley, and marked out by a survey made by Albinus Z. Sheldon in November, 1863, is not mineral and is vacant.        G. N. CHILCOTT,
        " *Register Land Office, Colo. Dist.*
        " C. B. CLEMENTS,
        " *Receiver Land Office, Colo. Ty.*"

To this letter the Land Office replied on January 16, 1864, stating —

" The evidence furnished by you is not sufficient in the opinion of this office, to prove that the selection No. 4 does not cover valuable mineral deposits. Your certificate is not based upon actual knowledge of the facts, but upon the infor-

mation and conclusions deduced from reasoning. This kind of proof is not deemed sufficient when large public interests may be involved, and the character of the location is made still more doubtful by the statement of ex-Governor Gilpin officially communicated to this office by Surveyor General Case, that there are mineral lands in that locality.

" The statement of the register and receiver required in our instructions is also wanting.

" The approval of the selection will stand suspended until some satisfactory proof is obtained upon the points indicated."

On February 12, 1864, the Land Office again wrote to the surveyor general the following letter:

" JOHN PIERCE, Esq., surveyor general, Denver City, Colo.

" Sir: I have considered your report of the 14th December last, respecting the survey made in November, 1863, by Deputy Surveyor Albinus Z. Sheldon, of what is known as the Luis Maria Baca float, in San Luis Park, in Colorado, and containing 92,293 acres.

" You transmit your certificate 'that the lands are not mineral and are vacant,' and state under specific heads 'the grounds on which' you 'have signed the certificate' and which are satisfactory to you. You report further that 'the survey as made by Mr. Sheldon is probably as near perfect as can be made, as the mountains at the northeast corner of the grant are inaccessible at any time of the year.'

" The act of Congress approved 21st June, 1860, U. S. Statutes at Large, vol. 12, page 71, chap. 167, confers authority for the location of the said Baca float in the then Territory of New Mexico, but now a part of Colorado Territory.

" The said statute makes it the 'duty of the surveyor general of New Mexico,' now in your jurisdiction, 'to make survey and location of the lands so selected by the heirs of Baca when thereunto required by them,' with a proviso making a three years' limitation to the statute.

" You further report that you have refunded to Mr. Gilpin the money placed in your 'hands and he has paid for the survey as a private survey, though he has permitted' you 'to

make an abstract of the field notes which ' you ' have placed on file in ' the surveyor general's office.

"This part of the proceedings is irregular. Under statutory requirements it is obligatory upon private claimants to pay for the survey of confirmed private claims, but the work must be done under the usual obligations and responsibilities both of deputies and surveyor general.

"The difficulty, however, may be avoided by pursuing the following course : The original field notes, duly verified and authenticated, must be filed in the surveyor general's office of Colorado ; upon bringing these to the usual satisfactory tests, and finding the same all regular and correct you are authorized in virtue of the aforesaid sixth section of the said act of 21st June, 1860, to approve the said survey, but in your certificate of approval you will add the special reservation stipulated by the statute, but not to embrace mineral land nor to interfere with any other vested rights if such exist.

"The statute does not order the issue of a patent. The aforesaid law of 21st June, 1860, with your plat approved in the manner indicated, will therefore constitute the evidence of title.

"You will take care so to arrange the matter that hereafter when in the gradual progress of the lines of the public surveys they shall reach the Baca location they shall be properly connected therewith and so appear on the township plats."

And again, on February 26, 1864, the Land Office sent the following to the surveyor general :

"SIR : At the request of William Gilpin, Esq., I herewith transmit the following papers, to wit :

"First. Mr. Gilpin's application for the survey of Grant No. 4 of the heirs of Baca, dated October 3, 1863.

"Second. Surveyor general's estimate of the cost of said survey, dated October 5, 1863.

"Third. Surveyor general's receipt for $600, deposited by Mr. Gilpin to pay for the above survey, October 6, 1863.

"Fourth. Certificate of the register and receiver at Golden City, Colorado, that the lands covered by the said Grant No. 4 are not mineral and are vacant, December 5, 1863.

"Fifth. The field notes of the boundary lines of the above grant, together with plat thereof.

"These papers were deposited in this office by Mr. Gilpin and are transmitted to you for such action as you shall deem proper in the premises in accordance with the views expressed in our communication to you, dated the 12th instant."

Thereupon the field notes of the survey with the certificate of the surveyor and his assistants were duly filed in the surveyor general's office and approved by him, his certificate of approval being in these words:

"The foregoing field notes of the survey of Grant No. 4, heirs of Luis Maria Baca, executed by Albinus Z. Sheldon, under his contract of the 7th day of October, 1863, having been critically examined, the necessary corrections and explanations made, the said field notes and the survey they describe are hereby approved."

In the general description accompanying the field notes is this statement by the deputy surveyor:

"This grant contains every grade of land from the most productive to the most sterile. La 'Trois Tetons' and the Chatillon Creeks have each rich bottom lands, from one half of a mile to a mile in width, extending nearly to the mountains. About six miles from the mountains the bottoms rapidly widen until along the west boundary they become almost an unbroken savannah, thickly covered with grass, red-top and other varieties, some of which is five feet in height.

"The grant contains about forty thousand (40,000) acres which may be classed as first rate. The balance, excepting the sand hills in the southeast corner (about six square miles) and the extreme mountain portion (say ten square miles) is good grazing land; and between the Chatillon and Arenas Creeks affords a rich growth of gramma grass.

"The Chatillon leaves the mountains at a point nearly equidistant between the north and south boundary lines, and runs in a due westerly direction until it is lost in the savannah above mentioned. These creeks are timbered about five miles. There is considerable good pine near the base of the mountains and firs higher up. Along the streams are cottonwoods

(sweet cottonwoods) of considerable size. There is no stone except in the vicinity of the mountains. These are composed mainly of a dense and fine grained granite varying to sienite and gneiss. Near their base is found a very compact conglomerate, parti-colored, and presenting more than the beauties of the mosaic art. Saw fragments of limestone (jurassic) but none in position. Saw no indications of the precious metals or minerals of any kind, unless the presence of iron may be inferred from the fluctuations of the needle set forth in the notes."

The map of the survey was also filed and approved by the surveyor general. A copy of the map, with the certificate of approval, is on page 324.

On March 29, 1864, the surveyor general forwarded to the Land Office a transcript of the field notes and plat of the survey with his approval entered thereon, the receipt whereof was acknowledged by the Land Office in a letter of date May 4, 1864, which letter is as follows :

"JOHN PIERCE, Esq., surveyor general, Denver City, C. T.

"SIR : Your letter of March 29 last, transmitting transcript and field notes of the survey of Grant No. 4, of the heirs of Luis Maria Baca, has been received at this office."

These were all the proceedings had at the time in reference to the location, survey and transfer of title of this grant.

Subsequently, and on January 14, 1868, application was made for a patent, and declined by the Land Office in these words:

"SIR : Referring to your application of 12th inst. for the issuing of patent for the tract of land in Colorado known as 'Baca Tract No. 4,' I have to state that the selection authorized by the sixth section of the act of 21st June, 1860, (Stats. vol. 12, page 72,) has been made, and the survey executed and reported to this office, but as no provision is made in the statute for the issuing of patent, the survey and statute are the only authorized evidences of title, this office having no authority to issue patents unless the statute expressly orders the same, which is not done in the Baca case, but 'that a grant may be made by a law as well as a patent pursuant to a law is undoubted (6 Cr. 128) ; a confirmation by a law is as

# MAP OF THE SURVEY OF GRANT Nº4 OF THE HEIRS OF
## Luis Maria Baca in San Luis Valley Colorado Territory

Scale three miles to one inch.
REDUCED FROM
one mile to one inch

The above map of the boundary lines of Grant No. 4
of the heirs of Luis Maria Baca in San Luis Valley
Colorado Territory, as surveyed by Albinus Z. Sheldon
under his contract bearing date the 7th day of
October 1863, is strictly conformable to the field
notes on file in this office, which have been
examined and approved, subject to the conditions
and provisions of Sec. 6 of the act of Congress
approved June 21st 1860.

Surveyor Generals Office   JOHN PIERCE
Denver March 18th 1864 Sur. Genl. Colo & Utah

fully to all intents and purposes a grant, as if it contained in terms a grant *de novo.'* "

Again, in March, 1879, a further application was made through the surveyor general of Colorado for a patent. This application was denied; and the Commissioner of the General Land Office, in his letter declining to issue a patent, after reciting the history of the grant, stated:

" After the selection, but previous to the location, the Commissioner of the General Land Office instructed the surveyor general of Colorado that, as the statute did not authorize the issuing of a patent, the act of June 21, 1860, and the plat approved by the surveyor general would constitute the evidence of title.

" There is no doubt that the Government may convey and vest the legal title without issuing a patent as effectually as may be done by patent. (*Larriviere* v. *Madegan*, 1 Dillon, 455; *Grignon* v. *Astor*, 2 Howard, 319; 3 Opinions of Att'y Gen. 350.)

" The surveyor general was authorized by the act to locate only vacant non mineral land. Unless the contrary appeared it would be presumed from the act of locating that the surveyor general determined the land was not mineral. But before locating, the surveyor general had expressly found and certified that this land was not mineral.

" It is now alleged that the land is mineral; that the surveyor general approved the plat of survey ' subject to the conditions and provisions of section six of the act of Congress, approved June 21, 1860,' and that, therefore, the grantees cannot hold the land under that act.

" The conditions and provisions of the act of June 21, 1860, were as respects this question, that the selection and location should be on land determined at the time of such location, when the title passed, to be non mineral land.

" The act did not intend that if at any subsequent time in the remote future, mineral should be discovered, the title should be unsettled, or that the title should be the subject of controversy through all time, as often as any one might choose to allege its mineral character.

"The surveyor general did not undertake, and had no power, to impose conditions not in the act.

"If after fifteen years the question as to the mineral character of the land may be reopened, why may it not be raised again after the lapse of any number of years? If the question may be reopened as to the land granted under the provisions of the act of June 21, 1860, why may it not as to land acquired under the homestead, preëmption and other acts of Congress? Would such titles ever be considered secure?

"The question as to the mineral or non mineral character of this land has been passed upon by competent authority; the title has passed from the Government and vested in private individuals; this office has no authority to reopen the question; the land cannot longer be regarded as a part of the public domain.

"Mr. Gilpin, who claims this tract of land as the assignee of the Baca heirs, makes personal application for a patent. It is not claimed that the granting act authorized a patent to issue, but that it is authorized by section two of the act approved March 3, 1869 (15 Stat. 342), and by section 2447, Rev. Stat. U. S. But those provisions authorize a patent to issue only when claims to land have been confirmed by law; that is, where an act of Congress recognizes a claim to specific land, and does not apply to cases where the acts of Congress only authorize a claim to be made thereafter to land without regard to any specific tract or parcel of land. This office can issue patents only where it is authorized by some act of Congress. The application of Mr. Gilpin for a patent must therefore be refused."

Subsequently, and on June 28, 1884, in response to inquiries as to whether prospectors would be allowed to hold any mineral discoveries made on said location, the Land Office replied as follows:

"In the case of location No. 4, in question, the surveyor general having first ascertained and determined that the land selected was vacant and non mineral, surveyed and located it, and approved the plat of the location, March 18, 1864, and this approved plat, in the absence of any provision of law for

the issuing of patent, became the evidence of title in the owner of the land so located.

"On a subsequent application by Governor Gilpin for a patent, it was contended, before this office, that mineral existed in some part of the location, and therefore the grantee could not hold the land under the act. The matter was fully considered and the following conclusions reached:

"The conditions and provisions of the act of June 21, 1860, were, as respects this question, that the selection and location should be on land determined, at the time of such location, when title passed, to be non mineral.

"The act did not intend that if at any subsequent time, in the remote future, mineral should be discovered, the title should be unsettled, or that the title should be the subject of controversy through all time, as often as one might choose to allege its mineral character.

"The surveyor general did not undertake, and had no power to impose conditions not in the act.

"The question as to the mineral or non mineral character of the land has been passed upon by competent authority; the title has passed from the Government and vested in private individuals, and this office has no authority to reopen the question; the land can no longer be regarded as a part of the public domain.

"You will see by the foregoing that the land in question was determined, in 1864, by the surveyor general, whose province and duty it was, to be non mineral; the location was then perfected and the title passed. Whether prospectors will be allowed to hold any mineral discoveries thereon, prior to or since 1880, must probably rest between them and the holders of the location No. 4."

And again, on June 8, 1889, in response to a similar application the acting commissioner replied as follows:

"In determining the various questions involved in the case, this office on March 21, 1879, decided that the character of the land involved had already been determined, and the matter, therefore, was *res adjudicata.*

"The question as to the mineral or non mineral character

of this land has been passed upon by competent authority; the title has passed from the Government and vested in private individuals. This office has no authority to reopen the question. The land can no longer be regarded as a part of the public domain, etc.

"The case has, therefore, become final so far as this office is concerned."

In the annual report of the surveyor general of Colorado of the proceedings of his office, dated October 1, 1864, which was transmitted to Congress in the report of the Secretary of the Interior for 1864, it is stated :

"During the month of November, 1863, deputy surveyor A. Z. Sheldon made a survey of Grant No. 4 of the heirs of Luis Maria Baca, as located by William Gilpin, attorney for said heirs, under the act of June 21, 1860. The survey was made under the usual guarantee of its accuracy, and the field notes returned to this office for approval. Under instructions from the General Land Office dated February 12, 1864, that survey and location were approved, subject to the conditions and restrictions above referred to."

And in the report of the Commissioner of the General Land Office of the same year, and included in the same report to Congress, it is also stated :

"In Colorado Territory the returns of surveys for the last fiscal year consist of correction, parallel, township and sectional lines, with fifty miles of private grant embracing over 431,000 acres of public lands. Also 92,292 acres in the fourth location of the Las Vegas grant, as confirmed by the act of 21st June, 1860, to the heirs of Luis Maria Baca, the premises formerly falling within the limits of New Mexico, but now of Colorado."

In the same volume is found a map accompanying the report of the Secretary of the Interior, which shows Baca Grant No. 4 segregated from the public domain, and it was admitted by counsel that all government maps issued from that time to this make a similar showing of the segregation of this tract.

The plaintiff and those under whom he claims have been in continuous and actual possession of this Baca Grant No. 4 since

at least 1869 ; in 1881 a fence was built entirely around the tract except for a little distance in the northeast corner, where the precipitous character of the mountains created a natural fence, and from that date onward to the present time it has remained under enclosure ; and the plaintiff and his grantors have paid the annual taxes levied thereon by the State of Colorado, amounting, since the year 1877, to $66,000.

In 1876 François Herard and two associates discovered a mineral vein, which they named the " Eastern Star," and on June 16 of that year filed a certificate of location in the proper office ; but in 1877, upon ascertaining that this mineral location was within the limits of the Baca grant, they abandoned the mine.   In 1879 the owners of the grant leased this mine to one William Young, but he immediately thereafter threw up the lease.   In 1883 the mine was again leased to the Gold Legion Mining and Milling Company, but this company soon abandoned the lease.   In 1887 the defendant took a verbal lease from the manager of the grant for three months, at the expiration of which time he sought a renewal of the lease, but was refused.   Subsequently to this refusal he took possession of the property, and has remained in such possession ever since. And it is this mine, with the adjacent ground, the possession of which was sought to be recovered by this action.

*Mr. Edward O. Wolcott* and *Mr. Joel F. Vaile* for plaintiff in error.

*Mr. John R. Smith* for defendant in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

In 1860, in settlement of a claim under a Mexican grant to land in the vicinity of Las Vegas, Congress passed an act giving to the claimants an equal amount of land, to be by them selected elsewhere in the Territory of New Mexico, stipulating that the land should be vacant and non-mineral and should be located within three years in square bodies not exceeding five

in number. Within the three years they selected and located the tract in question as one fifth of the land to which they were thus entitled. They applied to the proper officers of the United States to take such steps as would perfect their title. More than thirty-four years ago the Land Department took its final action. Since then it has continuously treated the tract as private land, and refused to recognize it in any way as part of the public domain; within the same year, 1864, in which it took its final action, it reported the fact thereof to Congress, and that body has never in any way questioned the rightfulness of the action taken. And now at the end of this lapse of time the title is challenged, and challenged upon propositions which, if sustained, establish that the owners have never had, and do not now have, any certain title to a single foot of the land, and this although they have been in undisturbed possession all these years, and have paid taxes to the state authorities amounting to $66,000 at least and probably more.

The party who challenges the title of the plaintiff to the particular portion of the tract in controversy in this suit entered at first into possession of it as a tenant, and when at the termination of his lease he was refused a continuance thereof, took steps to maintain a possession and assert a right adverse to his former landlord. It is undoubtedly true that settled rules of law cannot be ignored because in any particular case their application works apparent harshness. At the same time the result to which the contentions of the defendant lead may well compel a careful examination of them.

These contentions are that Congress granted only non-mineral lands; that this particular tract is mineral land, and therefore by the terms of the act is not within the grant; that no patent has ever been issued, and therefore the legal title has never passed from the Government; that the Land Department never adjudicated that this was non-mineral land, but on the contrary simply approved the location, subject to the conditions and provisions of the act of Congress, thereby leaving the question of title to rest in perpetual abeyance upon possible future discoveries of minerals within the tract.

In examining these contentions it is well to consider first

the act of Congress of June 21, 1860, and the circumstances under which it was passed. For, as said in *Winona & St. Peter Railroad* v. *Barney*, 113 U. S. 618, 625, in reference to legislative grants, "they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." This act was a final disposition by Congress of certain claims under Mexican grants for lands situate in the Territory of New Mexico. The circumstances and character of these claims had been reported to Congress by the surveyor general of the Territory. Some of them were confirmed as reported and *in toto*, and, as stated in *Tameling* v. *U. S. Freehold & Emigration Co.*, 93 U. S. 644, *Maxwell Land Grant case*, 121 U. S. 325, and other cases, such confirmation operated as a grant *de novo*, and took effect at once as a relinquishment by Congress of all rights of the United States to the premises. Others were confirmed in part and for only fractions of the areas claimed, and as to them, by section 2, it was made "the duty of the surveyor general of New Mexico immediately to proceed to make the surveys and locations authorized and required by the terms of this section." Another claim was not confirmed, but leave was given to the claimant to bring suit, with a proviso that if the suit should not be instituted within two years the claim should be presumed to have been abandoned; and in respect to the claim before us the right of location was to continue in force for three years and no longer. Obviously, the thought was that these claims should not only be finally but speedily disposed of. It was not contemplated that the title should remain unsettled, a mere float for an indefinite time in the future.

As the amount of the Las Vegas claim was large, and as the claimants were required to make their locations "in square bodies, not exceeding five in number," each location would necessarily be of a tract of considerable size; in fact, each one

was nearly 100,000 acres. The tract thus located was as a whole to be non-mineral. No provision was made for indemnity lands in case mineral should be found in any section or quarter section. So that when the location was perfected the title passed to all the lands or to none.

It will also be perceived that Congress did not permit this location to be made anywhere in the public domain, but only within the limits of the Territory of New Mexico. It was not like a military land warrant, subject to location upon any public lands, but only a grant which could be made operative within certain prescribed and comparatively narrow limits — limits not even so broad as those of the territory ceded by Mexico. There were then but few persons living in New Mexico; it contained large areas of arid lands; its surface was broken by a few mountain chains, and crossed by a few streams. It was within the limits of this territory, whose condition and natural resources were but slightly known, that Congress authorized this location. The grant was made in lieu of certain specific lands claimed by the Baca heirs in the vicinity of Las Vegas, and it was the purpose to permit the taking of a similar body of land anywhere within the limits of New Mexico. The grantees, the Baca heirs, were authorized to select this body of land. They were not at liberty to select lands already occupied by others. The lands must be vacant. Nor were they at liberty to select lands which were then known to contain mineral. Congress did not intend to grant any mines or mineral lands, but with these exceptions their right of selection was coextensive with the limits of New Mexico. We say " lands then known to contain mineral," for it cannot be that Congress intended that the grant should be rendered nugatory by any future discoveries of mineral. The selection was to be made within three years. The title was then to pass, and it would be an insult to the good faith of Congress to suppose that it did not intend that the title when it passed should pass absolutely, and not contingently upon subsequent discoveries. This is in accord with the general rule as to the transfer of title to the public lands of the United States. In cases of homestead, preëmption or townsite entries,

the law excludes mineral lands, but it was never doubted that the title once passed was free from all conditions of subsequent discoveries of mineral. As was said in *Deffeback* v. *Hawke*, 115 U. S. 392, 404, where this matter was considered:

"We also say lands *known* at the time of their sale to be thus valuable, in order to avoid any possible conclusion against the validity of titles which may be issued for other kinds of land, in which, years afterwards, rich deposits of mineral may be discovered. It is quite possible that lands settled upon as suitable only for agricultural purposes, entered by the settler and patented by the Government under the preëmption laws, may be found, years after the patent has been issued, to contain valuable minerals. Indeed, this has often happened. We, therefore, use the term *known* to be valuable at the time of sale, to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued." See also *Colorado Coal Co.* v. *United States*, 123 U. S. 307.

How was the character of the land to be determined, and by whom? The surveyor general of New Mexico was directed to make survey and location of the lands selected. Upon that particular officer was cast the specific duty of seeing that the lands selected were such as the Baca heirs were entitled to select. It is not strange that he was the one named; for, in the original act of 1854, which made provision for the examination of these various claims, the duty of such examination was cast upon the same officer, and he was there required "to ascertain the origin, nature, character and extent of all claims to lands under the laws, usages and customs of Spain and Mexico; and, for this purpose, may issue notices, summon witnesses, administer oaths and do and perform all other necessary acts in the premises," and it was upon his report that Congress acted. Further, he was the officer who, by virtue of his duties, was most competent to examine and pass upon the question of the character of the lands selected. We do not mean that Congress thereby created an independent tribunal outside of and apart from the

general Land Department of the Government. On the con-
trary, the act of 1854 provided that he should act under in-
structions from the Secretary of the Interior, and so undoubt-
edly in proceeding to make survey and location as required by
section 6 of the act of 1860, he was still subject to the control
and direction of the Land Department; but while he was not
authorized by this section to act in defiance or independently
of the Land Department he was the particular officer charged
with the duty of making survey and location, and it was for
him to say, in the first instance at least whether the lands so
selected, and by him surveyed and located, were lands vacant,
and non-mineral. This is in accord with the views of the
Land Department, as appears from the official letter of June
28, 1884, written in response to an application for the right to
make mineral locations within the tract, in which the Com-
missioner, after stating what had taken place, added: "You
will see by the foregoing that the land in question was de-
termined, in 1864, by the surveyor general, whose province
and duty it was, to be non mineral; the location was then
perfected and the title passed."

It is also worthy of note that Congress did not consider
that there was any great probability of the discovery of min-
eral wealth in New Mexico. By the act of 1860 it confirmed
various claims, amounting to millions of acres; confirmed
them absolutely and without any reservation of mines then
known or to be thereafter discovered within their limits. And
this, although under Spanish if not under Mexican law, all min-
erals were perpetually reserved from such grants. 1 Rock-
well's Spanish and Mexican Law, p. 49, secs. 1, 2 and 3, pp.
112, 113 and 114. It made no appropriation for the ex-
ploration of the claims to be thereafter located, and although
it required the completion of this location within three years,
it made but meagre appropriation for surveys, the appropria-
tion in 1860 for surveying both the public lands and private
land claims in New Mexico being only $10,000. Act of June
25, 1860, c. 211, 12 Stat. 104, 108.

It will also be perceived that the surveyor general, as well
as the register and receiver of the land office, each certified

that the land was non-mineral. These certificates were their decision to that effect. They were made in accordance with the original instructions sent out by the Land Department in July, 1860, and in this respect they were all that was required by those instructions, which were " in either case [that is, whether the selection is either within or outside the existing surveys] the final condition of the certificate to this office must be accompanied by a statement from yourself and the register and receiver that the land is vacant and not mineral." Thus the proper officer decided that the land was non-mineral, and accompanied the report of the survey and location with all the certificates and statements required by the original instructions from the Land Department.

But it is said that, the attention of the Land Department having been called to the fact that this location was made upon lands supposed to contain minerals, it was not satisfied with the requirements it had originally made; was not content with the certificates demanded of the surveyor general and the register and receiver, and expressly disapproved the evidence in fact furnished thereby, and, also, that while it finally authorized an approval of the survey and location, it directed that the certificate of approval should contain the special reservations named in the statute; that is, that the location should not embrace mineral lands. It is undoubtedly true that the suspicions of the Land Department were aroused by the report that was made as to the supposed character of the land embraced within this location, and that by its letter of January 16, 1864, it held that the evidence furnished as to the character of the land was not sufficient. This letter criticises the certificate of the surveyor general on the ground that, as appeared from an accompanying letter, it was based not solely upon his personal knowledge, but upon " information and conclusions deduced from reasoning." It also notes the fact that the certificate of the register and receiver required by the instructions was wanting. There is a seeming conflict between the statements in this letter and the records of the surveyor general's office. The latter indicate that the certificate of the register and receiver was forwarded with the

certificate of the surveyor general, while the letter of the Commissioner says that the former was lacking. This apparent contradiction may arise from the fact that the certificate of the register and receiver was sent in a different enclosure, or perhaps it was overlooked by the Commissioner of the Land Office. At any rate, it was about that time, at least, sent to the Land Department, for, as appears from the letter of February 26, it was returned by that department to the surveyor general. Obviously the Land Department, after sending the letter of January 16, reconsidered its action. It had received the certificate of the register and receiver, and had before it all the certificates required by the original letter of instructions, and instead of continuing the suspension of an approval for further proof, as indicated by the letter of January 16, it wrote, on February 12, to close the matter up, pointing out how all the difficulties which stood in the way could be removed. This letter notes the fact that by the statute it is made the duty of the surveyor general to make the survey and location. It contains no disapproval of the certificates or evidence furnished; authorizes him to approve the survey, although it directs that to his certificate of approval he "add the special reservation stipulated by the statute, but not to embrace mineral lands." It further notifies him that the statute does not provide for a patent, and that the law with the plat approved by him in the manner indicated will constitute the evidence of title. Thereupon the surveyor general proceeded to approve the survey, his certificate of approval being absolute and unconditional. He also approved the plat, though his certificate of approval to that was made as required by the letter of February 12, "subject to the conditions and provisions of section 6 of the act of Congress approved June 21, 1860." He also forwarded to the Land Department the field notes, the survey and the plat with his certificates of approval attached, and they were received and filed by the department without objection. But one conclusion can be deduced from these proceedings, and that is that the Land Department, perceiving that its original instructions had been strictly complied with; that no money had been appropriated

by Congress for actual exploration of the lands; that no way was open for securing further evidence as to their character; that the time within which any other location could be made had passed; that it was the right of the locators to have the question settled and the title confirmed or rejected, ordered the closing of the matter, the passage of the title, and sought to protect the interests of the Government and guard against any criticism of its action by directing an entry in the certifi-. cate of approval that it was made subject to the conditions and provisions of the act of Congress.

In this three things are to be noticed: First, that the surveyor general, the officer specially designated to make the survey and location, the one primarily charged with the duty of determining its character, decided that the land was non-mineral. His certificate to that effect is unqualified. His certificate of approval to the field notes and the survey is the same. So far, therefore, as his action is concerned, there was an adjudication that the land was non-mineral. Second, the Land Department directed that the matter be closed, specified how it should be closed, and received and filed without question the report of the surveyor general's action. Third, the only qualification or limitation is found in the direction of the Land Department, followed by the action of the surveyor general in adding to his certificate of approval of the plat the proviso that it is " subject to the conditions and provisions of section 6 of the act of Congress of June 21, 1860." There was no reservation of the matter for further consideration in the Land Department or by the surveyor general. There was a finality so far as they were concerned.

What is the significance of, and what effect can be given to the clause inserted in the certificate of approval of the plat that it was subject to the conditions and provisions of the act of Congress? We are of opinion that the insertion of any such stipulation and limitation was beyond the power of the Land Department. Its duty was to decide and not to decline to decide; to execute and not to refuse to execute the will of Congress. It could not deal with the land as an owner and prescribe the conditions upon which title might be transferred.

It was agent and not principal.  Congress had made a grant, authorized a selection within three years, and directed the surveyor general to make survey and location, and within the general powers of the Land Department it was its duty to see that such grant was carried into effect and that a full title to the proper land was made.  Undoubtedly it could refuse to approve a location on the ground that the land was mineral. It was its duty to decide the question — a duty which it could not avoid or evade.  It could not say to the locator that it approved the location provided no mineral should ever thereafter be discovered, and disapproved it if mineral were discovered; in other words, that the locator must take the chances of future discovery of minerals.  It was a question for its action and its action at the time.  The general statutes of Congress in respect to homestead, preëmption and townsite locations provide that they shall be made upon lands that are non-mineral, and in approving any such entry and issuing a patent therefor could it be tolerated for a moment that the Land Department might limit the grant and qualify the title by a stipulation that if thereafter mineral should be discovered the title should fail?  It cannot in that way avoid the responsibility of deciding and giving to the party seeking to make the entry a full title to the land or else denying it altogether. As said in *Deffeback* v. *Hawke, supra,* 406 :

"The position that the patent to the plaintiff should have contained a reservation excluding from its operation all buildings and improvements not belonging to him, and all rights necessary or proper to the possession and enjoyment of the same, has no support in any legislation of Congress.  The land officers, who are merely agents of the law, had no authority to insert in the patent any other terms than those of conveyance, with recitals showing a compliance with the law and the conditions which it prescribed."

Further, it must be noticed that the Land Department has since 1864 again and again decided that the action then taken was final, that the land had been segregated from the public domain and become private property.  Thus, so far as the judgment of the executive branch of the government is con-

cerned, the finality of the action taken in passing the title has been settled. But we may go further. As appears by the report of the surveyor general and of the Land Department, transmitted to Congress in 1864, the fact that this land had been finally appropriated to the claim of the Baca heirs was disclosed. Mention of that fact was also made in subsequent reports to that body, and yet from that time to the present Congress has taken no action in the matter, and has thus by its silence confirmed the proceedings of the Land Department.

Defendant relies largely on the decision of this court in *Barden* v. *Northern Pacific Railroad,* 154 U. S. 288, in which it was held that lands identified by the filing of the map of definite location as within the scope of the grant made by Congress to that company, although at the time of the filing of such map not known to contain any mineral, did not pass under the grant if before the issue of the patent mineral was discovered. But that case, properly considered, sustains rather the contentions of the plaintiff. It is true there was a division of opinion, but that division was only as to the time at which and the means by which the non-mineral character of the land was settled. The minority were of the opinion that the question was settled at the time of the filing of the map of definite location. The majority, relying on the language in the original act of 1864 making the grant, and also on the joint resolution of January 30, 1865, which expressly declared that such grant should not be " construed as to embrace mineral lands, which in all cases shall be and are reserved exclusively to the United States," held that the question of mineral or non-mineral was open to consideration up to the time of issuing a patent. But there was no division of opinion as to the question that when the legal title did pass — and it passed unquestionably by the patent — it passed free from the contingency of future discovery of minerals.

Referring to the contention that if the question of mineral was open for consideration until the issue of a patent there would be great uncertainty in titles, the court said (pp. 326–7):

" We do not think that any apprehension of disturbance in titles from the views we assert need arise. The law places

under the supervision of the Interior Department and its subordinate officers, acting under its direction, the control of all matters affecting the disposition of public lands of the United States, and the adjustment of private claims to them under the legislation of Congress. It can hear contestants and decide upon the respective merits of their claims. It can investigate and settle the contentions of all persons with respect to such claims. It can hear evidence upon and determine the character of lands to which different parties assert a right; and when the controversy before it is fully considered and ended, it can issue to the rightful claimant the patent provided by law, specifying that the lands are of the character for which a patent is authorized."

It quoted these words from the opinion in *Smelting. Company* v. *Kemp*, 104 U. S. 636, 640:

"The execution and record of the patent are the final acts of the officers of the Government for the transfer of its title, and, as they can be lawfully performed only after certain steps have been taken, that instrument, duly signed, countersigned and sealed, not merely operates to pass the title, but is in the nature of an official declaration by that branch of the Government to which the alienation of the public lands, under the law, is entrusted, that all the requirements preliminary to its issue have been complied with. The presumptions thus attending it are not open to rebuttal in an action at law."

And added (329–330):

"There are undoubtedly many cases arising before the Land Department in the disposition of the public lands where it will be a matter of much difficulty on the part of its officers to ascertain with accuracy whether the lands to be disposed of are to be deemed mineral lands or agricultural lands, and in such cases the rule adopted that they will be considered mineral or agricultural, as they are more valuable in the one class or the other, may be sound. The officers will be governed by the knowledge of the lands obtained at the time as to their real character. The determination of the fact by those officers that they are one or the other will be considered as conclusive.

\*        \*        \*        ·   \*        \*

" It is true that the patent has been issued in many instances without the investigation and consideration which the public interest requires; but if that has been done without fraud, though unadvisedly, by officers of the Government charged with the duty of supervising and attending to the preparation and issue of such patents, the consequence must be borne by the Government until by further legislation a stricter regard to their duties in that respect can be enforced upon them. The fact remains that under the law the duty of determining the character of the lands granted by Congress, and stating it in instruments transferring the title of the Government to the grantees, reposes in officers of the Land Department."

But, it is said, no patent was issued in this case, and therefore the holding in the *Barden case*, that the issue of a patent puts an end to all question, does not apply here. But the significance of a patent is that it is evidence of the transfer of the legal title. There is no magic in the word " patent," or in the instrument which the word defines. By it the legal title passes, and when by whatsoever instrument and in whatsoever manner that is accomplished, the same result follows as though a formal patent were issued. *Rutherford* v. *Greene*, 2 Wheat. 196, 206 ; *Bryan* v. *Forsyth*, 19 How. 334 ; *Langdeau* v. *Hanes*, 21 Wall. 521, 531, in which this court said : " If the claim be to quantity, and not to a specific tract capable of identification, a segregation by survey will be required, and the confirmation will then immediately attach the title to the lands segregated." The land passes out of the jurisdiction of the Land Department. The grant has then become complete, and the only remedy for any wrong in the transfer of such title is through the courts, and not in the Land Department. *Michigan Land & Lumber Company* v. *Rust*, 168 U. S. 589, 592, and cases cited in the opinion. In this case the Land Department refused to issue a patent; decided that it had no power to do so, and that the title was complete without one. It would seem strange to hold that the lack of a patent left the question of mineral an open one when there was no authority for the issue of a patent, when it was in fact refused and when the

title passed the same as though a patent had issued. There was not at the time of these transactions, and has not since been, any statute specifically authorizing a patent for this land. Sec. 2447, Rev. Stat. taken from the act of December 22, 1854, c. 10, 10 Stat. 599, applies only to the case of a claim to land " which has heretofore been confirmed by law." And the same may be said as to the special act of March 3, 1869, c. 152, 15 Stat. 342. Here there had been no claim confirmed to any tract of land, but only the grant of a right to locate. In that respect it was like a land warrant, subject to location anywhere within the specified territory. As to land warrants, however, there is a specific provision for the issue of patents. Rev. Stat. § 2423. The Land Department was, therefore, technically right when it said that the statute did not order the issue of a patent, and that the case was one in which the granting act with the approved survey and location made a full transfer of title. Very likely if a patent had been issued the courts would not have declared it void, but have sustained it as the customary instrument used by government to make a transfer of the legal title. *Carter* v. *Ruddy*, 166 U. S. 493. But as there was no statute in terms authorizing a patent, it was not within the power of the locators to compel the issue of one. No court would by mandamus order such issue in the absence of a specific and direct statute requiring it. So when the department refused to issue one the locators had no alternative but to accept that which the statute had provided as the means of acquiring and the evidence of title, and that must be treated as having all the efficacy of a patent.

Summing up the whole matter it results in this: Congress in 1860 made a grant of a certain number of acres, authorized the grantees to select the land within three years anywhere in the Territory of New Mexico, and directed the surveyor general of that territory to make survey and location of the land selected, thus casting upon that officer the primary duty of deciding whether the land selected was such as the grantees might select. They selected this tract. Obeying the statute and the instructions issued by the Land Department, that officer approved the selection and made the survey and loca-

tion. The Land Department, at first suspending action, finally directed him to close up the matter, to approve the field notes, survey and plat, and notified the parties through him that such field notes, survey and plat, together with the act of Congress, should constitute the evidence of title. All was done as directed. Congress made no provision for a patent and the Land Department refused to issue one. All having been done that was prescribed by the statute, the title passed. The Land Department has repeatedly ruled that the action then taken was a finality. It has noted on all maps and in its reports that this tract had been segregated from the public domain and become private property. It made report of this to Congress, and that body has never questioned the validity of its action. The grantees entered into actual possession and fenced the entire tract. They have paid the taxes levied by the State upon it as private property, amounting to at least $66,000. While the approval entered upon the plat by the surveyor general under the direction of the Land Department was in terms "subject to the conditions and provisions of section 6 of the act of Congress, approved June 21, 1860," such limitation was beyond the power of executive officers to impose.

We are of. opinion that at this late day the title of the locators and their grantees is not subject to challenge, and that it is a full, absolute and unconditional title.

*The judgment of the Circuit Court will, therefore, be reversed and the case remanded for a new trial.*