# LANE *v.* WATTS.

PUBLIC LANDS; OFFICERS; PRIVATE LAND CLAIMS; INJUNCTIONS; CONFLICT-
ING CLAIMS; SURVEYS; DEEDS.

1. The Secretary of the Interior and Commissioner of the General Land Office may be enjoined from exercising jurisdiction and control over former public land whose title has passed from the government to claimants.

2. A location of public land beyond the then existing surveys in the Territory of New Mexico, under a grant by Congress of vacant nonmineral land, was followed by instructions by the Commissioner of the General Land Office to the surveyor general of New Mexico to make a survey in the regular process of surveys, and to forward his own certificate and the certificates of the register and receiver, that the land was vacant and nonmineral; but no survey was in fact made. The Commissioner disapproved the surveyor general's approval of the location (which was accompanied by the statement that the certificates were not necessary, as the location was beyond the public surveys, and nothing could be known about it), and, with knowledge that the recorder and receiver had subsequently certified that the location was vacant and nonmineral, so far as their records showed, the land not having been surveyed, issued a communication to the surveyor general of the Territory of Arizona, which then embraced the land, reciting the approval by the surveyor general of New Mexico, and directed the former to make a survey, upon payment of the cost by the claimant, and to send to the General Land Office the field notes and plats which should "constitute the muniments of title, the law not requiring the issue of patents on these claims." At the same time the Commissioner added his own certificate that, the certificate of the surveyor general of New Mexico "having been submitted to this department, and having undergone a careful examination," instructions had been given to the surveyor general of Arizona "to run the lines indicated and forward complete survey and plat to be placed on record for future reference as required by law." *Held,* that although no survey was actually made, the location was in effect confirmed, and title vested in the grantee.

3. A finding by the Commissioner of the General Land Office, of the vacant and nonmineral character of land located under a grant by Congress of vacant and nonmineral land, and his confirmation of the location,

cannot be disturbed by the Land Office when the land is subsequently found to possess mineral-bearing qualities.

4. The Commissioner of the General Land Office cannot annul or cancel the act of his predecessor.

5. The confirmation by the General Land Office of a location of land under an act of Congress granting the right to locate land then in the territory of New Mexico, and directing the survey to be made by the surveyor general of that territory, cannot be assailed on the ground that it was based on the latter's approval, which was executed before the organization of the Territory of Arizona, rather than on the approval of the surveyor general of Arizona, which embraced the location upon its organization, and whose government was organized and became operative before any survey was made.

6. The confirmation by the General Land Office, so as to pass title to a location of land made conformably to a grant by Congress, is not affected by the fact that, at the time of the location and confirmation, there were undisclosed claims to the land under Mexican land grants.

7. Land granted in consideration of the relinquishment of the grantee's claim to other lands under a Mexican land grant, by an act of Congress directing the survey to be made by the surveyor general of New Mexico, in which the land was situated, cannot be said to be derived from a foreign state or government, within the meaning of the act of Congress of June 2, 1862 (12 Stat. at L. 410), providing that claims or grants so derived shall be surveyed at the expense of the claimants.

8. A deed which is over thirty years old, and bears no suspicious indicia, proves itself. (Citing *Ford* v. *Ford*, 27 App. D. .C. 401, 6 L.R.A. (N.S.) 442, 7 Ann. Cas. 245.

No. 2584. Submitted October 16, 1913. Decided December 1, 1913.

HEARING on an appeal by the defendants, the Secretary of the Interior and the Commissioner of the General Land Office, from a decree of the Supreme Court of the District of Columbia enjoining them from proceeding in the matter of certain attempted entries under the public land laws. *Affirmed.*

The COURT in the opinion stated the facts as follows:

This appeal is from a decree in the supreme court of the District enjoining Franklin K. Lane, the Secretary of the Interior, and Clay Tallman, the Commissioner of the General Land

Office, from proceeding in the matter of certain attempted entries under the public land laws upon lands which, the decree finds, were selected and located by the heirs of Luis Maria Cabeza de Baca on June 17, 1863, and known as Baca Float No 3, the title to which, the decree further finds, passed out of the United States, and vested in said heirs on April 9, 1864. The decree further directs the filing of the field notes and plats of survey of said Float, for the purpose of defining the outboundaries thereof and segregating the same from the public lands of the United States.

By the treaties of Guadalupe Hidalgo and Mesilla, the territory embracing the present States of New Mexico and Arizona was ceded to the United States. Prior thereto Mexico had made numerous grants of land within this territory. As was natural, this country enacted legislation looking to the determination of the validity and extent of those grants. The act of July 22, 1854 (10 Stat. at L. 308, chap. 103), created the office of surveyor general for the territory of New Mexico, and made it his duty to examine into all claims for lands within the limits of that Territory, and to make report thereof to Congress. Under the provisions of this act the heirs of Baca, by John S. Watts, their attorney, presented to the surveyor general of New Mexico their claim to a Mexican grant called Las Vegas Grandes. The town of Las Vegas, at about the same time, filed its petition for the same tract of land. The surveyor general reported to Congress that in his opinion "the land embraced in either of the two grants is lawfully separated from the public domain, and entirely beyond the disposition of the general government, and that in the absence of one, the other would be a good and valid grant." He suggested that inasmuch as he had no power to decide between conflicting claimants, they should be referred to "the proper tribunals of the country for the adjudication of their respective claims." On May 19, 1860, the Senate committee on private land claims, reporting on these conflicting grants, said: "To this tract the two claimants are, first, the heirs of Luis Maria Baca, who claim under a grant made by the provincial department of Durango to said Baca and his

seventeen sons on May 29, 1821, which grant was ratified and confirmed on February 1, 1825, by the departmental assembly of New Mexico. This grant was in fee, and is a genuine and valid title. Second, the town of Las Fegas, or Las Vegas. This town claims under a grant made on March 25, 1835 * * *." The committee, after commenting upon the confusion that would naturally result if the respective claimants were remitted to the courts for the adjustment of their conflicting claims, said: "The claimants under the title to Bàca, also represented by Judge Watts as their counsel, have expressed a willingness to waive their older title in favor of the settlers, 'if allowed to enter an equivalent quantity of land elsewhere within the Territory; and your committee cannot doubt that Congress will cheerfully accept the proposal, which, indeed, would undoubtedly have been acceded to by Mexico if the Territory had remained hers, and to whose rights and duties the United States have succeeded."

Thereupon, by act of June 21, 1860 (12 Stat. at L. 71, chap. 167), it was provided (sec. 6): "That it shall be lawful for the heirs of Luis Maria Baca, who make claim to the said tract of land as is claimed by the town of Las Vegas, to select, instead of the land claimed by them, an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in square bodies not exceeding five in number; and it shall be the duty of the surveyor general of New Mexico to make survey and location of the lands so selected by said heirs of Baca when thereunto required by them: Provided, however, That the right hereby granted * * * shall continue in force during three years from the passage of this act, and no longer." The Commissioner of the General Land Office, in a communication to the surveyor general of New Mexico, directed attention to this act, and said: "To give this law timely effect, you will give priority in surveying private claims to this claim. * * * You will proceed to have the exterior lines of Las Vegas Town claim property run and connected with the lines of public surveys; the exact area of the Las Vegas Town tract having been thus ascertained, the right will accrue to the Baca claimants to

select a quantity equal to the area of the tract elsewhere in New Mexico of vacant land, not mineral, in square bodies not exceeding five in number. You will furnish them with a certificate transmitting at the same time a duplicate to this office, of their right and the area they are to select in five square parcels. Should they select in square bodies according to the existing line of the surveys, the matter may be properly disposed of by their application duly indorsed and signed, with your certificate designating the parts selected by legal divisions or subdivisions, and so selected as to form five separate bodies in square form. Then the certificate thus indorsed is to be noted on the records of the register and receiver of Santa Fé, and sent on here by those officers for approval. Should the Baca claimants select outside the existing surveys, they must give such distinct descriptions and connection with natural objects in their applications to be filed in your office, as will enable the deputy surveyor, when he may reach the vicinity of such selections in the regular progress of the surveys, to have the selections adjusted as near as may be to the lines of the public surveys, which may hereafter be established in the region of those selections.

"In either case the final conditions of the certificate to this office must be accompanied by a statement from yourself and register and receiver that the land is vacant, and not mineral."

Thereafter, it was ascertained by the surveyor general of New Mexico that the Las Vegas grant contained 496,446.96 acres, and the heirs of Baca were accordingly notified, about December, 1860, that they were entitled to select, in not more than five square bodies, an amount of land equal to said area upon any of the unoccupied lands, not mineral, of New Mexico. In October, 1862, there was filed an application on behalf of said Baca heirs to locate one of their so-called Floats at a place called Bosque Redondo. The description of this Float, as given in the application, was somewhat vague and indefinite. This was Float No. 3, and was to cover 99,289.39 acres. On January 18, 1863, the attorney for the Baca heirs, Mr. Watts, addressed a letter to the Commissioner of the General Land Office asking for leave to withdraw said attempted location, and, on

February 5th, following, leave was granted, the Commissioner in his letter saying: "As the application *has not been ripened into a specific location,* no locality having been designated according to any recognized lines of the public surveys, *nor reported by the surveyor general as definitely acted upon,* this office accedes to the request of Mr. Watts to withdraw the application."

Thereafter, on June 17, 1863, a second application for the location of said Baca Float No. 3 was filed with the surveyor general of New Mexico, as follows: "I, John S. Watts, the attorney of the heirs of Don Luis Maria Cabeza de Baca, have this day selected as one of the five locations confirmed to said heirs under the 6th section of the act of Congress approved June 21st, 1860, the following tract, to wit, commencing at a point one mile and a half from the base of the Solero Mountain in a direction north 45 degrees east of the highest point of said mountain, running thence from said beginning point west 12 miles, 36 chains, and 44 links, thence south 12 miles, 36 chains, and 44 links, thence east 12 miles, 36 chains, and 44 links, thence north 12 miles, 36 chains, and 44 links, to the place of beginning, the same being situate in that portion of New Mexico now included by act of Congress approved February 24, 1863, in the Territory of Arizona,—said tract of land is entirely vacant, unclaimed by anyone, and is not mineral to my knowledge." On the same day the surveyor general prepared a certificate of the application to be sent to the Commissioner of the General Land Office. This certificate concludes with the words: *"Said location is hereby approved."* On the next day the surveyor general sent this certificate to the Commissioner, and in his letter of transmittal said: "As this location is far beyond any of the public surveys, I have not deemed it necessary to procure any certificate from the register and receiver of the Land Office, as, from the nature of the case, they cannot officially know anything concerning it." On July 18, following, the Commissioner wrote the surveyor general concerning this application, saying, *inter alia:* "Your approval of the location under consideration is found to have ignored the imperative

condition that the lands selected at the base of Salero Mountain, now included by act of Congress approved February 24, 1863, in the Territory of Arizona, is vacant land, and not mineral. Before the application of Location No. 3 of the heirs aforesaid can be approved by this office, it is necessary that our instructions of the 26th July, 1860, should be complied with by furnishing a statement from yourself and register and receiver that the land thus selected, and embracing one fifth of the claim, or 99,289$\frac{39}{100}$ acres, is vacant, and not mineral."

On April 2, 1864, while the surveyor general of New Mexico was in Washington, he filed in the office of the Commissioner of the General Land Office an acknowledgment of the receipt of the foregoing letter of July 18, 1863, of the Commissioner, and, among other things, said: "As I am personally unacquainted with that region of country, I cannot certify that the land in question is 'vacant, and not mineral,' or otherwise. Those facts can only be determined by actual examination and survey." On the margin of this letter, and opposite the words quoted, appears the following notation: "See letter fr. Hon. Watts of March 27, 1864, inclosing R & R certificates." The letter to which this notation refers is addressed to "W. Wrightson, Esq.," and reads as follows: "You will please find inclosed the certificate of the register that the location made in Arizona is vacant, and not mineral, so far as the records of their office show. I hope this certificate will enable you to get the location confirmed." In the certificates referred to, dated March 25, 1864, the receiver certified that the lands contained in this Float "are vacant, and not mineral, so far as the records of this office show (not having been surveyed)." The register certified that these lands "are not surveyed, and from all information in this office, are vacant, and not mineral." On April 9th, following, request having been made for the survey of this land, the Commissioner of the General Land Office, in a communication to the surveyor general of Arizona, said: "By an examination of the papers herewith inclosed relating to the third of the series of the Luis Maria Baca grants confirmed by the 6th section of an act of Congress approved June 21, 1860, you will perceive that the

location of the one-fifth part of said grant as set forth by the claimants has been approved by the surveyor general of New Mexico, under whose jurisdiction the application properly came at the date of the approval.   *   *   *   In order to avoid delay, you, are hereby authorized whenever said claimants shall pay, or secure to be paid, to you a sum sufficient to liquidate all the expenses incident thereto, office work included, to contract with a competent deputy surveyor, and have the claim numbered 3 of the series surveyed as described in the inclosed application. Transcripts of the field notes and plats certified in accordance with the requirements of the law will be transmitted to this office, and will constitute the muniments of title, the law not requiring the issue of patents on these claims." The Commissioner then directed that the deputy surveyor be instructed how to mark the outboundaries of the location. The Commissioner then quoted said certificate dated June 17, 1863, of the surveyor general of New Mexico, and appended the following certificate of his own:

General Land Office, April 9, 1864.
Levi Bashford, Esq., Surveyor General, Tucson, Arizona:
   Sir:—
   The foregoing statement and the certificate of Surveyor General Clark having been submitted to this Department and having undergone a careful examination, the location being approved by him to perfect title under the authority of the act approved June 21, 1860, application for survey having been made.   Instructions (copy herewith attached) have been given to Surveyor General Levi Bashford, of Arizona, in which Territory the lands located now are, to run the lines indicated, and forward complete survey and plat to be placed on file for future reference as required by law.
                    (Signed) J. M. Edmonds, Com'r.

   On April 30, 1866, the attorney for the heirs of Baca, in a communication to the Commissioner of the General Land Office, directed attention to said location of June 17, 1863, to the fact

that war in that part of the Territory of Arizona and the hostility of the Indians had prevented a personal examination, and that, when the subsequent examination of the location was being made by Mr. Wrightson, it was found that much of the land intended to be included in the location had been left out; that Mr. Wrightson had been killed by the Indians, and that, by reason of the mistake that had been made in the initial point of location, no survey had been made. Permission was therefore asked to change the initial point of the location, which, of course, would have effected a material change in the location. It was further stated in this communication that the land embraced in the change was of the same character as that included in the approved location. The Commissioner thereupon, on May 21, 1866, directed the surveyor general of New Mexico, under whose jurisdiction the matter then came, to cause a survey to be executed in accordance with the amended description, provided that, by so doing, the outboundaries of the grant thus surveyed would embrace vacant lands not mineral. The heirs of Baca were thereupon notified that a survey in accordance with the amended description would be made, providing they deposited a sum sufficient to defray the expenses. As no deposit was made, the directions contained in this communication were not carried out. The Department finally ruled (29 Land Dec. 44) that the heirs of Baca were bound by the selection of June 17, 1863, because a survey in accordance with the amended description of April 30, 1866, would amount to a "complete change of location."

On November 10, 1904, the Commissioner of the General Land Office recommended that the exterior boundaries of Baca Float No. 3 should be surveyed "for the purpose of administering the public land laws, and in order that applicants under said laws may be forced to no unnecessary trouble, expense, or delay in perfecting titles to which they believe they have a right under the general land laws." Thereupon, the Secretary of the Interior directed said survey to be made, and one was made through Philip Contzen, deputy surveyor, who, on November 23, 1906, duly filed the plats and field notes in the office of the

surveyor general of Arizona. While this survey was in progress, the surveyor general made examination of the character of the land and collected considerable supposed evidence concerning its mineral character prior to 1863, and reported the result of his investigation to the Department of the Interior with a recommendation that said Baca Float No. 3 be rejected. Thereupon the Commissioner of the General Land Office ordered a hearing before the surveyor general to determine whether said lands were, at the time of said location, vacant and nonmineral, and this order was finally sustained on appeal to the Secretary of the Interior. It further appears that certain applications for homestead entries within the limits of this Float have been made, and that the Department has allowed them to proceed, but has withheld final action thereon until final decision upon this Baca Float.

The final hearing of the case was upon bill, answer, and documentary evidence.

*Mr. C. Edward Wright, Mr. Preston C. West, Mr. F. W. Clements,* and *Mr. William C. Prentiss* for the appellants.

*Mr. Weldon M. Bailey, Mr. Joseph W. Bailey, Mr. Herbert Noble, Mr. G. H. Brevillier,* and *Mr. James W. Vroom* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

Appellants contend that the title to this land was not to pass from the United States to the heirs of Baca, unless and until the surveyor general should survey and examine the same, and report to the Department that such survey and examination disclosed that the land was vacant and not mineral, June 17, 1863. Appellees insist, on the other hand, and the court below adopted their view, that the title to this land passed out of the United States and vested in the heirs of Baca on April 9, 1864. If title did so pass, it is plain that what remained to be done after the survey had been made, namely the filing of the plat

and field notes, was a mere ministerial act, the doing of which the court might direct. *Ballinger* v. *United States,* 216 U. S. 240, 54 L. ed. 464, 30 Sup. Ct. Rep. 338; *Board of Liquidation* v. *McComb,* 92 U. S. 531, 23 L. ed. 623. It is equally plain that the court would have power to restrain the Department from attempting to exercise jurisdiction and control over this land after it had vested in the heirs of Baca, to their injury. *Noble* v. *Union River Logging R. Co.* 147 U. S. 165, 37 L. ed. 123, 13 Sup. Ct. Rep. 271; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 620, 56 L. ed. 570, 576, 32 Sup. Ct. Rep. 340. We will proceed, therefore, to determine this the vital question in the case.

In *Shaw* v. *Kellogg,* 170 U. S. 312, 42 L. ed. 1050, 18 Sup. Ct. Rep. 632, there was involved Baca grant No. 4. In that case the Department, not being fully satisfied that the land selected was nonmineral, although the proper surveyor general and register and receiver had furnished certificates to that effect, approved the location, survey, and field notes, but directed the surveyor general to add to his certificate of approval the special reservation stipulated by the statute that the land thus selected should not embrace mineral lands, nor interfere with any other vested rights, if such should exist. The Land Office noted on its maps that this tract had been segregated from the public domain, and had become private property, and so reported to Congress. The grantees entered into possession, fenced the tract, and paid all taxes assessed upon it by the State. It was held that the action taken by the Land Department was a finality, and that the title then passed, and hence that the limitation attempted to be inserted by the surveyor general, under the direction of the Department, was beyond the power of executive officers to impose. While the facts of that case differ quite materially from the facts of this, the opinion of the court contains much that is helpful in the determination of the questions arising in this case. The court then directed attention to the fact that said act of June 21, 1860, "was a final disposition by Congress of certain claims under Mexican grants for lands situated in the Territory of New Mexico;" that some of those

claims had been confirmed as reported and *in toto*; and that the confirmation operated as a grant *de novo*, and amounted to a relinquishment by Congress of all rights of the United States to the premises. After referring to certain other claims, including that of the Baca heirs, the court said: "Obviously, the thought was that these claims should not only be finally but speedily disposed of. It was not contemplated that the title should remain unsettled, a mere float for an indefinite time in the future." The court observed, further, that at the time of this legislation, there were but few persons living in New Mexico; that it contained large areas of arid lands; that its surface was broken by a few mountain chains and crossed by a few streams. "It was," said the court, "within the limits of this Territory, whose conditions and natural resources were but slightly known, that Congress authorized this location." The court further observed that while Congress did not intend to grant any lands then known to be mineral, it could not have been intended that a grant should be rendered nugatory by any future discoveries of minerals. The court pointed out that Congress evidently did not consider that there was any great probability of the discovery of mineral wealth in New Mexico, for by said act it confirmed claims amounting to millions of acres, with no reservation of mines then known, or to be thereafter discovered, within their limits; and that no appropriation was made for the exploration of claims to be thereafter located, although it required the completion of this location within three years.

The location in the present case was made in virtue of the same act of Congress that was before the court in *Shaw* v. *Kellogg*. The tract of land located was square in form, so that, if the initial point was definitely determined, no difficulty whatever would be encountered thereafter in fixing the identity of the location. In the first letter of the commissioner to the surveyor general of New Mexico, he was told that, should the Baca claimants select outside of the existing surveys, they must give such distinct descriptions and connection with natural objects as would enable the deputy surveyor, "when he might

reach the vicinity of such selections *in the regular progress of the surveys,"* to have the selections adjusted, as near as might be, to the lines of the public surveys; that the final certificate to the Land Office must be accompanied by the statement from the surveyor general, register, and receiver, as to the vacant and nonmineral character of the land.  The application for the location of this part of the grant was thereupon made, and in that application, it will be noted, the claimants strictly complied with the requirements that they give such distinct description and connection with natural objects as would permit of the identification of the tract.  Indeed, while this application was filed in 1863, and the actual survey was not made for more than forty years, no difficulty whatever seems to have been encountered in tracing the outboundaries of the land therein described.  It was probably owing, in part, to the definite character of this description, that the surveyor general, in forwarding the application to the Land Office, added his certificate approving the location of this grant.  Owing to conditions then obtaining, and to which the court referred in *Shaw* v. *Kellogg,* the surveyor general deemed it unnecessary to procure any certificate from the register and receiver.  The Land Office, however, not being satisfied upon this point, immediately notified the surveyor general that before the approval by the Land Office of said application of location, prior instructions should be complied with, and the Office furnished with a statement from the surveyor general, register, and receiver, as to the vacant and nonmineral character of this land.  Subsequent to the date of this communication from the Land Office, the surveyor general went to Washington and there filed in the Land Office, as we have seen, on April 2, 1864, his acknowledgment of the letter of the office requiring such certificates, saying that, inasmuch as he was unacquainted with the region of country comprising the location, he could not certify as requested, and that the facts could only be determined by actual examination and survey. The certificates of the register and receiver were then on their way to Washington, for they are dated March 25, 1864.  Counsel for appellants insist that these certificates' did not reach the

Land Office until after the action of the Commissioner on April 9th approving this location and directing the survey of the land. Whether they did or not is immaterial, for it is apparent, from the notation on the surveyor general's letter, "See letter of Mr. Watts inclosing R & R certificates," that the Land Office came into possession of information of a sufficiently satisfactory character as to cause it to reconsider and recede from its previous decision requiring further proof as to the nonmineral character of this land. Giving to this notation the effect to which it is now entitled, and indulging in the inferences naturally deducible therefrom, we must assume that when the communication of April 9th was sent forth by the Commissioner, he knew of the views entertained by the register and receiver concerning the character of this land, and that he considered those views and the other evidence before him sufficient, in the circumstances of the case, to justify him in approving the location. It must be borne in mind that the surveyor general had previously written that the location was so far beyond any public surveys that he did not even deem it nec , ary to procure any certificate from the register and receiver, and that, as observed by the supreme court in *Shaw* v. *Kellogg*, it was not then thought by anyone that there was any great probability of the discovery of mineral wealth in the Territory. Indeed, it is not probable that this grant was then considered of any particular value. At all events, we find opposite the statement of the surveyor general that, he being personally unacquainted with the region of country embracing this location, the facts as to its mineral character could only be determined by actual examination and survey, the notation admittedly made by the Land Office officials specifically directing attention to the letter of Mr. Watts inclosing the certificates of the register and receiver, and expressing the hope that such certificates would result in the confirmation of the location. We must assume from the record before us that the Land Office was then in possession of information upon which it was satisfied to act, notwithstanding the lack of knowledge on the part of the surveyor general. An analysis of the communication of the Commissioner to the surveyor general of Arizona

lends cogency to this view.   Attention is there drawn to the
approval of the location by the surveyor general of New Mexico,
"under whose jurisdiction the application properly came at the
date of the approval."   The surveyor general of Arizona is then
authorized, whenever the claimants shall pay or secure to be
paid a sum sufficient to liquidate the expenses incident thereto,
to have "the claim numbered 3 of the series surveyed *as de-
scribed in the inclosed application."*   He was to transmit to the
Land Office transcripts of the field notes and plats duly certi-
fied.   There was not a word in this communication requiring or
suggesting an examination of this land at the time of this
survey, for the purpose of determining whether it was nonmin-
eral in character.   The sole duty devolving upon the surveyor
general in carrying out these instructions was *to make the sur-
vey* and, when made, to transmit to the Land Office his field
notes and plats, that the same might "constitute the muniments
of title, the law not requiring the issue of patents on these
claims."   Still further proof of the intent of the Land Office is
found in the certificate which, for some reason, the Commission-
er deemed necessary to accompany the specific directions includ-
ed in the communication of even date, for therein it is recited
that the foregoing statement and certificate of the surveyor gen-
eral of New Mexico had been submitted to the Department,
*"and, having undergone a careful examination, the location be-
ing approved by him to perfect title under the authority of the
act approved June 21, 1860,* application for survey having been
made," instructions had been given to the surveyor general of
Arizona "to run the lines indicated, and forward complete sur-
vey and plat to be placed on file for future reference as required
by law."   We think the conclusion irresistible, from the lan-
guage of this certificate, that the Commissioner, having carefully
considered all the facts in the case, concluded to adopt the ap-
proval of the surveyor general of New Mexico of this location
to perfect title under the authority of said act, and, in order
completely to segregate this land from the public domain, or-
dered the survey.

A survey was necessary.   "The general rule being to exact a

survey, the grant here under consideration could only be exempted from this requirement by an express statement in the act of Congress indicating an intention to depart from the rule in the particular instance." *Stoneroad* v. *Stoneroad,* 158 U. S. 240, 250, 39 L. ed. 966, 969, 15 Sup. Ct. Rep. 822. The statute of June 21, 1860, under which this location was made, clearly contemplates that a survey shall be made. But when the Land Office, upon whom devolved the duty of passing upon the location of this land, had acted, we think the title became absolutely confirmed in the heirs of Baca, and that the survey which the Land Office directed to be made was essential only "for the purpose of definitely segregating the land to which the right was confirmed, from the public domain, and thus finally fixing the extent of the rights of the owners of the grant." *Stoneroad* v. *Stoneroad,* 158 U. S. 240, 39 L. ed. 966, 15 Sup. Ct. Rep. 822. And when the title to this land passed out of the United States and vested in these heirs, the finding as to the character of the land could not thereafter be disturbed by the Land Office. "One officer of the Land Office is not competent to cancel or annul the act of his predecessor. That is a judicial act and requires the judgment of a court." *United States* v. *Stone,* 2 Wall. 525, 17 L. ed. 765. The claim of jurisdiction to readjudicate the character of the land, which we have found passed out of the United States, amounted to an attempt to deprive the heirs of Baca of their property without due process of law. *Noble* v. *Union River Logging R. Co.* 147 U. S. 165, 37 L. ed. 123, 13 Sup. Ct. Rep. 271; *Moore* v. *Robbins,* 96 U. S. 530, 24 L. ed. 848.

Counsel for appellants have raised the question whether the proper surveyor general originally approved the location of this grant. The basis for this contention is the act of Congress of February 24, 1863 (12 Stat. at L. 664, chap. 56), to provide a temporary government for the Territory of Arizona. That government, however, was not established until January, 1864. A surveyor general for Arizona was provided for by this act, but he was to receive no salary until his active duties commenced. It is conceded that he did not open an office in Arizona until January, 1864. The act of June 21, 1860, under which

this grant was located, expressly provided that the surveyor general of New Mexico should make the survey and location, of course, under the direction and supervision of the Land Office. At the time he assumed jurisdiction to act, the surveyor general of Arizona had not assumed the duties of his office, and, as ruled by the Commissioner of the Land Office in his communication of April 9, 1864, to the surveyor general of Arizona, he unquestionably had jurisdiction of the application at the date of its approval by him. But this is of small moment here, for, after all, it made little difference which surveyor general acted. The material question is whether the Land Office, upon whom devolved the ultimate responsibility, approved the location. That approval was given, and the rights of these heirs then became fixed. It is very clear, we think, that the act under which the location was made contemplated present action by the Land Office, and not action fifty years deferred.

We do not think the efforts to change the location in question affect the situation here. The Department itself has repeatedly ruled that all those efforts were abortive, and, hence, that the claimants must be remitted to this location. In their answer, appellants aver that there were conflicting Mexican grants to some of the land included in this Float, and that it therefore was not subject to location in 1863. It is conceded that no rights under those grants had been asserted agreeably to the provisions of said act of July 22, 1854 (10 Stat. at L. 308, chap. 103). Under that act the Secretary of the Interior promulgated regulations requiring all claimants to appear and present evidence of their title. The matter, therefore, did not become *sub judice* until the filing of the claim. In other words, when this location was made by the Baca heirs, the alleged Mexican grants, to which attention is now drawn, were mere undisclosed claims. Clearly the existence of such undisclosed claims did not deprive the Land Office of jurisdiction over the land embraced in this location. But this is a question with which we need not be concerned. If, as suggested by the court below, adverse claims are made to any portion of this tract of land, the questions arising out of such claims will properly be

adjudicated in the courts where the lands are located.  The question with which we are concerned is whether, upon this record, title passed out of the United States and vested in the Baca heirs in 1863.

The act of June 21, 1860, imposed upon the surveyor general of New Mexico the duty to make survey of this land when required by the heirs of Baca, and the act of June 2, 1862 (12 Stat. at L. 410, chap. 90), merely required that claims or grants derived from a foreign state or government should be surveyed at the expense of the claimants.  This grant was not derived from a foreign state or government, but was made to compensate the heirs of Baca for the relinquishment of their foreign grant.  We think, therefore, that the Land Office was in error when it required the deposit of the estimated cost of survey as a prerequisite to its being made at all.

Appellees base their claim of title upon a deed dated May 1, 1864, to John S. Watts, which was recorded within one year from its date.  This deed purports to have been executed by the heirs of Baca.  Inasmuch as it is more than thirty years old and bears no suspicious indicia, it proves itself.  *Ford* v. *Ford,* 27 App. D. C. 401, 6 L.R.A.(N.S.) 442, 7 Ann. Cas. 245; *Applegate* v. *Lexington,* 117 U. S. 255, 29 L. ed. 892, 6 Sup. Ct. Rep. 742; *Foote* v. *Brown,* 81 Conn. 218, 70 Atl. 699; *Hodge* v. *Palms,* 54 C. C. A. 570, 117 Fed. 396.  In the absence of any evidence attacking appellees' chain of title, it is enough if they have established a prima facie title.  Clearly they have done this.  Decree affirmed, with costs.          *Affirmed.*

An appeal to the Supreme Court of the United States was allowed January 5, 1914.