James A. WOLLAN, Plaintiff,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, United States Department of Agriculture, United States Forest Service, Elizabeth Estill, regional Forester, Rocky Mountain Region R2, Denver, Defendants.

Civil Action Nos. 97–K–36, 98–K–215.

United States District Court,
D. Colorado.

Feb. 26, 1998.

Dante L. Zarlento, Zarlengo & Kimmell, LLC, Denver, CO, George Maurice Allen, George M. Allen, Naturita, CO, for Plaintiff.

Michael E. Hegarty, U.S. Attorney's Office, Civil Div., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

These consolidated actions arise out of attempts by Plaintiff James Wollan to force the rescission of certain land conveyances made by the defendant government agencies to various Colorado resort entities in the 1980s and 1990s. Wollan claims an interest in 75 acres of the subject lands based on a mining claim dating back to 1890. The disputed acreage includes the base area of the Keystone Resort and the development lands adjacent to it, located in Summit County, Colorado.

Wollan's claims first surfaced in 1996, when he protested a proposed land exchange involving Vail Summit Resorts, Inc. ("Vail") (formerly known as Ralston Resorts, Inc., and Keystone Resorts Management, Inc.) and the U.S. Forest Service. The Bureau of Land Management (BLM) rejected Wollan's claims of ownership and denied his request for correction of conveyance documents. The Interior Board of Land Appeals (IBLA) upheld the BLM's decision. Acting *pro se,* Wollan initiated Civil Action No. 97–K–36 in

this court seeking review of this final administrative action.[1] In October 1997, after securing counsel, Wollan filed a Second Amended Complaint in 97–K–36 seeking, *inter alia,* a "reversal of adverse rulings by the [Interior Board of Land Appeals]; a declaration confirming his right, title and interest in the lands at issue; rescission of the subject conveyances; and a "confirmation" of his title under the Color of Title Act (43 U.S.C. § 1068)."

On December 2, 1997, the BLM issued a decision in a related action in which Wollan sought an administrative declaration of his interest in the subject lands under the Color of Title Act. Wollan filed a separate appeal of this decision on January 30, 1998. That appeal, Civil Action No. 98–K–215, is largely duplicative of the issues raised in 97–K–36 and the two actions have been consolidated.

Before me now is a motion for summary judgment filed by Defendants Keystone/Intrawest L.L.C. ("Keystone") and Vail (collectively, the "Keystone Defendants"). The Keystone Defendants claim the instant actions are but another in a series of "fanciful" attempts by Wollan to conjure, "from thin air," an interest in the subject land. The Keystone Defendants maintain that none of Wollan's claims is factually or legally cognizable, and argue in the instant motions that Wollan's claims, "whatever they are," are barred by federal and state statutes of limitation. I agree.

## I. *FACTS.*

There are three claim areas relevant to this dispute. A rectangular area Wollan identifies as the "Ellwood Placer," an 1890 mining claim made by seven individuals, including S.E. Ellwood. The land to which Wollan claims an interest is located inside the Ellwood Placer boundary. Within the Ellwood Placer boundary, and extending beyond it to the west and south, is the Black Homestead Patent issued in 1919 to Thomas

A. Black. Wollan has released and waived, in writing, any claim to this area, which Vail purchased in fee in 1941 from Max Dercum, who, in turn, had purchased it from Black's widow, Isabella, after Black died. *See* Estoppel, Release and Covenant Not to Sue (Ex. L, Defs.' Final Br. in Support of Mot. Summ. J.). Surrounding and overlapping the Ellwood Placer are areas of land patented by the federal government to Vail in 1986 as part of a land exchange with the United States Forest Service (USFS) (the "1986 Patent Lands") and additional areas patented by the government to Vail in 1992 (the "1992 Patent Lands").

A portion of the 1986 Patent Lands overlaps the northwest quarter of the Ellwood Placer boundary ("Disputed Area 1"). Another portion overlaps the east half of the Ellwood Placer ("Disputed Area 2"). A portion of the 1992 Patent Lands overlaps the southeast quarter of the Ellwood Placer ("Disputed Area 3"). After Wollan's waiver of claims to the Black Homestead, Disputed Areas 1, 2 and 3 are the only areas owned by Keystone being claimed by Wollan.

According to Wollan, Black purchased the 159–acre Ellwood Placer "mining claim" in 1911 from its original owners. Wollan asserts the characterization was "something of a misnomer," because a substantial farming and ranching operation was carried out on the land in addition to placer mining. These activities, Wollan claims, perfected an interest in the surface estate different from the interest in the underlying mineral estate, such that an abandonment of the mining claim would not have affected title to the land above. Because the Black Homestead Patent comprised only "75+"[2] acres of the surface estate, approximately 75 acres of "residual land" remained after the patent was sold to Dercum in 1941. According to Wollan, this land (Disputed Areas 1, 2 and 3)

---

**1.** Wollan simultaneously filed a separate action against the federal government, claiming the government ignored his family's interests when it patented the land to Vail and seeking compensation under the "takings" clause of the Fifth Amendment. Civil Action No. 97–K–31 has been stayed pending determination of 97–K–36.

**2.** Wollan claims Black actually applied for and obtained a patent for "somewhat more" than 75 acres. The "actual" acreage, according to Wollan, is more like 83 acres.

belonged to Thomas Black and his heirs and was invalidly patented to Defendants.

Wollan claims he acquired title to the land in 1994, when he purchased all "residual rights" to the Ellwood Placer from Thomas Blaylock. According to Wollan, Blaylock inherited alienable rights to Disputed Areas 1, 2 and 3 from his mother, who, in turn, had acquired them from her husband, Wollan's stepfather and grandson of Thomas and Isabella Black, when he died intestate in 1986. (Pl.'s Opposition to Defs.' Mot. Summ. J. at 4.) To support his claim, Wollan offers a document entitled "Black/Rice Heirship," which purports to trace Blaylock's interest to Thomas and Isabella Black,[3] a "Special Warranty Deed" Wollan drafted in 1995 to document his purchase,[4] and the report of Angus P. McIntosh. McIntosh, offered as an "expert in Western public land law [and] land regulations" (Pl.'s Opp. to Defs.' Mot. Summ. J. at p. 4), purports to have analyzed the homestead laws and other statutes and regulations in effect at the time of the Black patent application to conclude (1) that Black had acquired an interest in the Ellwood Placer surface estate distinct from the underlying mineral rights, and (2) that neither federal law nor the Dercum sale extinguished Black's interest in the 75 acres land not covered by the Black Homestead Patent, which remained "private property." *See* Eval. of the "Ellwood" Property at 5 (Pl.'s Opposition to Defs.' Mot. Summ. J., Ex. A–1). Accordingly, in McIntosh's expert legal opinion, "[i]f Wollan can trace his legal title to the 75 (74.9) acres ... to Thomas Black," then he "has a perfect legal title to the surface estate of 75 (74.9) acres" unabridged by the Dercum sale or federal law. *Id.*

According to Defendants, there is no basis in law or in fact for Wollan's claims. Further, Defendants argue, Wollan's claims are barred under the applicable statutes of limitations and by the additional affirmative defenses of estoppel and laches.

## II. *SUMMARY JUDGMENT STANDARD.*

Rule 56(c) © of the Federal Rules of Civil Procedure permits entry of summary judgment where the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The facts presented, and appropriate inferences that may be drawn from them, must be construed in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper only if, on these facts and inferences, a reasonable trier of fact could not return a verdict for the nonmoving party. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The very purpose of a summary judgment action is to determine whether trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). To avoid summary judgment, the nonmoving party therefore must refer to specific facts, beyond those in the pleadings, and demonstrate the existence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *White* at 360. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White* at

---

**3.** The document and its attached flow-chart schematic, is a list of conclusory assertions supported by nothing more than anecdotal or otherwise inadmissible evidence. The chain of ownership, through a series of apparently verbal "agreements" between siblings and "buyouts" of others' interests, culminates in the assumption, by Norman E. Rice, of *complete ownership* of the Ellwood Placer. According to Wollan, Rice, who was Blaylock's stepfather, died intestate in 1986 leaving the property to Norma Ann Rice Weidman (his daughter by his first marriage) and Ruby D. Rice, Blaylock's mother. Ruby, in turn, "devis[ed] the entire property at issue to [Blaylock]." (There is no mention in the document of

how Ruby came to devise her stepdaughter's interest in the property to Blaylock.)

**4.** The "Special Warranty Deed" states that Blaylock conveyed to Wollan "all rights, titles and interests in the properties and estates of Thomas Black, and/or Isabella Black, and/or Norman Rice, and/or Ruby D. Rice that he received from their wills" in exchange for "$100.00 plus 20% profits in anything I make good to sell from these rights." (Special Warranty Deed, attached to the Affid. of Earl Rice, Exs. Supp. Defs.' Mot. Summ. J, Tab 3.)

360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (1986). The instant case fails under this standard.

## III. *MERITS.*

In accordance with my rules regarding motions for summary judgment, the Keystone Defendants included a "Statement of Undisputed Material Facts" in their opening brief setting forth, "in simple, declarative sentences, separately numbered and paragraphed," the material facts Defendants believe are not in dispute and which support their entitlement to judgment. *See* Pretrial Procedures Mem. (Sep.1997). As required, Defendants ended each ·paragraph with a specific reference or citation to the record that establishes the asserted fact. Wollan did not comply with my rules regarding motions for summary judgment, neither admitting nor denying Defendants' asserted facts, nor offering anything more than conclusory factual assertions to support his claims.[5] The "facts" alleged in Wollan's sundry filings[6] are either offered without citations to the record, or with citations to documents that are either irrelevant, purely anecdotal, or which themselves simply assume facts that are otherwise established nowhere in the record.

Accordingly, the Defendants' Statement of Undisputed Facts, which establishes that patents for Disputed Areas 1, 2 and 3 were issued to Vail in 1986 and 1992, that Defendants have maintained continuous possession of the Areas since then, have expended more than $18 million improving them, and have conveyed various interests in the Disputed Areas—including townhomes and condominiums—to third parties, is adopted in its entirety. It is Plaintiff's burden to prove that he has superior title, and, in order to survive summary judgment, to come forward with sufficient evidence to refute Defendants' assertions that they are entitled to judgment as a matter of law. Based on my review of the record, I agree with Defendants that Wollan has failed under the Rule 56 summary judgment standard to establish the existence of a triable issue regarding the alleged superiority of his title.

### A. *Federal Statute of Limitations (Disputed Areas 1 and 2).*

 Defendants' initial argument is that Wollan's claim to Disputed Areas 1 and 2 is time barred. "Suits by the United States to vacate and annul any patent shall only be brought within six years after the date of issuance of such patents." 43 U.S.C. § 1166. Because only the government may contest and seek the cancellation of an issued patent, *Putnam v. Ickes,* 78 F.2d 223, 227 (D.C.Cir.), *cert. denied,* 296 U.S. 612, 56 S.Ct. 132, 80 L.Ed. 434 (1935), § 1166 applies with equal force when a third party stands in the shoes of the federal government to compel the vacatur or annulment of a patent. *See State of Alaska v. First Nat'l Bank of Anchorage,* 689 P.2d 483, 486 n. 12 (Alaska 1984)(state barred under § 1166 from attacking patent); *Putnam,* 78 F.2d at 226–28 (private individuals barred from seeking rescission of patent).

 In this case, Wollan seeks an order for the "rescission of the wrongful conveyances to [Defendants] by the United States of lands at issue in this suit." (Second Am. Compl. p. 11.) Accordingly, he stands in the shoes of the government and is bound by § 1166. "Once the six-year statute of limitations for challenging a patent specified in 43 U.S.C. § 1166 expire[s], the patent bec[omes] unassailable." *State of Alaska,* 689 P.2d at 486. It is undisputed that the limitations period has run with respect to the 1986 Patent of Disputed Areas 1 and 2. The Patent

---

**5.** My rules require any party opposing a motion for summary judgment to include a section in his brief entitled "Response to Statement of Undisputed Material Facts," in which he must "admit or deny the asserted material facts" and support any denial with a factual explanation and specific reference or citation to the record. None of the multiple briefs filed by Wollan conforms to these rules.

**6.** All told, Wollan has filed, or has sought leave to file, five responses or "supplemental" responses in opposition to Defendants' Motion for Summary Judgment. While I have not specifically granted Wollan leave to file anything beyond his 16–page "Supplemental Opposition," I have reviewed his filings. They do not alter my analysis or affect the conclusions reached.

was issued more than ten years before Wollan filed suit, and more than seven years before Wollan even claims to have acquired an interest in the land from Blaylock. Wollan is precluded under § 1166 from seeking the Patent's rescission. *Putnam*, 78 F.2d at 228.

Wollan attempts to avoid the application of § 1166 by distinguishing *Putnam* and recharacterizing his prayer for relief. Wollan argues that, as a third party with an "active claim to the property involved," he does not stand in the shoes of the government and is authorized under applicable caselaw to seek alternative remedies to enforce his alleged interest in the Disputed Areas without application of the six-year limitations period. Wollan's argument, which he simply asserts as a foregone conclusion, is premised on cases in which claimants, including the federal government, have been permitted to pursue alternative remedies for the enforcement of an adverse interest in patented land even though the patent itself had become "unassailable" by the running of the statute of limitations. *E.g. Capron v. Van Horn*, 201 Cal. 486, 258 P. 77, 81 (1927), *cert. denied*, 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 573 (1931)(error to dismiss action to enforce adverse equitable interest in patented land through imposition of a constructive trust); *United States v. Whited & Wheless*, 246 U.S. 552, 561–62, 38 S.Ct. 367, 368, 62 L.Ed. 879 (1918)(government could pursue action "to recover the value of lands fraudulently procured" by patentee, even if patent itself was unassailable by government upon expiration of six-year limitations period). As the *Capron* court explained, " '[T]he statute of limitations creates no right of action in the government nor the remedies for enforcing that right. It relates to the remedy, and in terms applies only to one remedy, that for annulling the patent.' " 258 P.2d at 81 (quoting *Whited & Wheless*, 246 U.S. at 562, 38 S.Ct. at 368). While Wollan's argument may be colorable in theory,[7] it has little bearing on the case before me.

Wollan's first mention of "alternative remedies" came in response to Defendants' Motion for Summary Judgment. Until then, Wollan's claims were directed solely at the annulment or invalidation of the Patents themselves. *See* Second Am. Compl. at 11 (court "should order rescission" of the patents and "enter a Declaratory Judgment confirming Wollan's right, title and interest in the lands.... [and] that Wollan is entitled to title and possession" of the land). There is no mention in his Second Amended Complaint of damages, the appointment of a trustee, or a return of the value of the patented lands.

The remedy Wollan seeks falls squarely within the purview of an action subject to the six-year limitations period of § 1166. *Putnam*, 78 F.2d at 226–28. Even assuming, for the sake of argument, that Wollan had again amended his Complaint to seek an alternative remedy that would not entail a direct challenge to the 1986 Patent, the facts he offers to support the right to such a remedy are insufficient to survive summary judgment. Wollan's claim of entitlement depends squarely on the "opinion" of Angus McIntosh that Black acquired rights to the surface area of the Ellwood Placer mining claim distinct from his right to the minerals below it and in addition to the Black Homestead Patent acreage later sold by his widow. As set forth more fully below, the argument is incorrect and the "expert opinion" supporting it improper.

Wollan's challenge to the 1986 Patent is time-barred.

B. *Residual Rights Extinguished by Operation of FLPMA (All Disputed Areas).*

Defendants also argue that Wollan is estopped from claiming any interest in Disputed Areas 1, 2 or 3 because any interest his predecessors may have had in them extinguished by operation of the Federal Land

---

**7.** And this is not entirely free from debate. *See Raypath, Inc. v. City of Anchorage*, 544 F.2d 1019, 1021 (9th Cir.1976)(as a matter of federal law, the validity of a patent may not be questioned in a suit brought by a third party against

the patentee)(citing *St. Louis Smelting and Refining Co. v. Kemp*, 104 U.S. 636, 647, 26 L.Ed. 875 (1881) and *Van Wyck v. Knevals*, 106 U.S. 360, 369, 1 S.Ct. 336, 340–41, 27 L.Ed. 201 (1882)).

Policy and Management Act of 1976 (the "FLPMA").

The FLPMA, 43 U.S.C. §§ 1701–85, was enacted to assist the BLM in administering and preserving public lands and their resources so future use can be projected and coordinated with other federal and state planning efforts. 43 U.S.C. § 1701(a)(1), (2). To accomplish this, the FLPMA mandated the inventorying and review of all public lands not previously designated for a specific use as well as those lands "effected by executive action or statute before October 21, 1976." 43 U.S.C. § 1701(a). For example, the Act authorized the Secretary to file a disclaimer of interest in public lands where the government's interest had become stale or otherwise invalid, and where doing so would "help remove a cloud on the title of such lands." 43 U.S.C. § 1745. For similar reasons, the Act provided for the extinguishment, as a matter of law, of the stale or invalid claims of others in public lands. *Id.,* § 1744.

Defendants contend § 1744 of the FLPMA extinguished any interest Blaylock or his predecessors may have had in the Ellwood Placer as of December 31, 1979, years before Blaylock "sold" his interest to Wollan. Section 1744 required owners of unpatented placer mining claims to file a "notice of intention to hold the mining claim" with supporting documents by December 31, 1979. The failure to so file would "be deemed conclusively to constitute an abandonment of the mining claim ... by the owner." 43 U.S.C. § 1744(c). It is undisputed that Norman Rice, Blaylock's stepfather and purported "owner" of all residual rights to the Ellwood Placer mining claim during the 1976–79 time period, filed no such notice or any other document as required under the FLPMA.

Wollan does not deny that § 1744 extinguished any residual interest his predecessors may have had in the Ellwood Placer

mining claim, but asserts the interest at issue is the Placer's "surface estate," which the FLPMA did not affect. As set forth above, Wollan invokes the "expert legal opinion" of Angus McIntosh to support the distinction between the surface and mineral rights that could be acquired under the homestead and mining laws in force at the turn of the century, and concludes the FLPMA had no bearing on the former. I agree with Defendants that Wollan's argument is incorrect and his reliance on the McIntosh Report improper.

■ As an initial matter, McIntosh's legal opinion as to what the homestead laws say or do not say and his conclusion that Wollan has "perfect title" under those laws to the 75 acres at issue is inapposite. Expert opinion on ultimate issues are generally inadmissible under the Federal Rules of Evidence. Fed. R. Evid. 702–704, *applied in Specht v. Jensen,* 853 F.2d 805, 807–810 (10th Cir.1988). Where the ultimate issue is a question of law, the opinion of a legal expert, even a lawyer, interferes with the judge's role as "sole arbiter of the law" and should not be allowed. *Id.* (reversing ruling allowing expert to opine as to whether there had been a "search" of plaintiff's home as this interfered with judge's role).

■ When a legal opinion is given in affidavit form, it should be stricken. *City of Chanute v. Williams Natural Gas Co.,* 743 F.Supp. 1437, 1446 (D.Kan.1990), *aff'd,* 955 F.2d 641 (10th Cir.1992)("[T]o the extent ... [an expert's] affidavit ... consists of legal arguments, the affidavit should be stricken."). This is particularly true where, as here, the legal conclusions are based on a series of anecdotal and hearsay facts established nowhere in the record and of which neither the expert (nor Plaintiff, from whom they are taken) could have any personal knowledge.[8]

■ Further, there is no merit in the legal argument McIntosh attempts to make.

---

8. For example, McIntosh assumes, solely on the basis of Wollan's assertions, that, after purchasing the Ellwood Placer claims, "Black used the land primarily for agricultural purposes" and, after receiving the Black Homestead Patent, "continued in the actual possession and settlement of [both] the 75/83 acre homestead *and* the remaining 74.93 acres of the Ellwood claim, constructing ditches, diverting water, building

fences and grazing livestock." McIntosh Rept. at p. 2 (Pl.'s Opposition to Mot. Summ. J. at Ex. A–1)(emphasis added). The only evidence in the record based on personal knowledge is the Declaration of Edna and Max Dercum. Dercum Decl. (attached as Ex. A to Defs.' Reply Support Mot. Summ. J.) At paragraph VI of the Declaration, the Dercums state that Wollan's reliance on anecdotal evidence from Edna's book, *It's Down-*

McIntosh asserts that various statutes enacted by Congress in the late 1800s and early 1900s converted Black's interest in the Ellwood Placer mining claim into an interest in the surface estate of the claim; enlarged Black's interest 75 acres beyond the 75 acres he applied for and received by patent; and vested "indefeasible" title in the additional acreage to Black and his successors without need of a patent. McIntosh Rept. at pp. 3–4. Even assuming Black had cultivated and settled the 75 acres beyond the Black Homestead and therefore had an interest in the surface estate of such land, there is no basis for the assertion that Black somehow obtained superior title to that land by operation of law.

McIntosh relies principally on the Act of March 4, 1921, (43 U.S.C. § 216), which he claims "validated" or "confirmed" Black's claim to the remaining 75 acres such that legal title passed out of the United States "as completely as if a patent had issued." McIntosh Rept. at 4. McIntosh neither quotes nor reproduces the Act's language, nor attempts to explain how it applies to Black or accomplishes what McIntosh says it does. The text of the statute shows that it was in fact a series of "private bills" authorizing the Secretary of the Interior to issue homestead patents to specific named individuals for specific parcels of land. None of these provisions relates in any way to the land in dispute. The provision at issue appears to be Section 1, which states generally that

All homestead entries pending on March 4, 1921, made in good faith prior to January 1, 1916, under the provisions of the enlarged homestead laws, and all rights to enter land under said laws, based on settlement made thereon in good faith before said date, and while the land was unsurveyed, by persons who, before making

such enlarged homestead entry, had acquired title to land under the homestead laws and therefore were not qualified to make an enlarged homestead entry, or such settlement, are validated, if in all other respects regular, in all cases where the original homestead entry was for less than one hundred and sixty acres of land: *Provided,* That no settlement claim shall be validated hereby where adverse claim for the land has been initiated before March 4, 1921.

This language does not purport to eliminate the need to perfect, survey or patent the additional entries it authorizes, but, more fundamentally, does not apply to the Black homestead under the facts alleged by Plaintiff.

The statute validated additional *entries* on land by a defined class of individuals who (1) made additional entries before 1916; (2) had acquired title to land under the homestead law before making such additional entries; and (3) were previously barred by law from making such additional entries because they had already received one homestead patent. Black was not within this class. It is undisputed that Black did not obtain title to his first homestead until 1919. He had no need for, and could not have benefitted from, the 1921 statute, because he was not under the disability it removed. (He was also no longer living, having died in 1919. His widow, Isabella, lived on the patented Black homestead until she sold it to the Dercums in 1941.)

Further, the language refers to entries previously made "under the provisions of the enlarged homestead laws." These laws required the filing of a patent application, including the submission of various "proofs" and "affidavits" establishing continuous culti-

---

*hill All the Way,* to support his contention that Black cultivated the remaining 74.93 acres of the Ellwood claim is "misleading." According to the Dercums, the fences, ditches and other "artifacts" Wollan claims constitute evidence that Black continued to possess and cultivate the "remaining land" were actually on the Black Homestead Patent, and not on the land surrounding it, which the Dercums understood was owned by the USFS. *Id.* at ¶¶ V, VI.

Similarly, McIntosh simply assumes that "Wollan traces his title and claim to the remaining acreage through mesne conveyance from the

heirs of Thomas Black." *Id.* This tracing is simply Wollan's narrative description of the "Black/Rice Heirship," which is unsupported by any evidence in the record. In fact, the only evidence in the record regarding the conveyance from Norman Rice to Blaylock's mother and from Blaylock's mother to Blaylock is that it never happened. *See* Decl. of Earl C. Rice (attached as Ex. 3 to Defs.' Exs. to Mem. Support Mot. Summ. J.) (Black's grandchildren agreed sibling, Norman Rice would care for property left by Isabella Black when she died and agreed it would not pass out of family line to Blaylock).

vation, that the land was of a type described by the laws, and that fees would be paid, and the issuance of a patent. *See e.g.,* Act of Feb. 19, 1909, 35 Stat. 639, 43 U.S.C. § 213–15. The use of the word "validate" cannot mean that the entryman automatically received title without a patent. Section 4 under the "private bill" portion of the statute uses the same term but also contemplates that proof of entry and the issuance of a patent are required. While the case of *Shaw v. Kellogg,* 170 U.S. 312, 18 S.Ct. 632, 42 L.Ed. 1050 (1898), which involved the direct legislative grant of lands to specific individuals in settlement of their claims under specific Mexican land grants, demonstrates that Congress may, if it wishes, grant land to individuals without also providing for the patenting of such land, it does not, as McIntosh suggests, support the assertion that Congress intended with the 1921 Act to abrogate normal patent procedures under the homestead laws. As Defendants point out, this would lead to the absurd result that the 1921 statute immediately vested title to land throughout the West which was not identified, legally described or surveyed. After that, how would anyone know who held title to what? [9]

### IV. *CONCLUSION.*

Defendants' legal arguments that they are entitled to judgment as a matter of law under Fed.R.Civ.P. 56 are succinct and persuasive. Plaintiff's legal arguments and the "evidence" he purports to offer in response are inadequate to create a triable issue on any of his claims. There is no legal or factual basis for his claim to superior title to any of the "remaining" Ellwood Placer surface estate now part of Disputed Areas 1, 2 and 3. There is no legal or factual basis for the claim that Thomas and Isabella Black acquired title to any Ellwood Placer land beyond that which Isabella sold to the Dercums in 1941. The administrative decisions of the BLM and IBLA are legally sound and supported by substantial evidence in the record. Accordingly,

IT IS ORDERED that judgment in Civil Action Nos. 97–K–36 and 98–K–215 shall en-

ter in favor of Defendants and against Plaintiff, with the parties to bear their own costs. Counsel for Plaintiff are advised to review the standard applicable to motions for reconsideration in this circuit before considering the filing of such a motion in this case. *E.g. M.M. v. Zavaras,* 939 F.Supp. 799, 800 (D.Colo.1996).

With respect to Civil Action No. 97–K–31, previously held in abeyance pending resolution of 97–K–36, IT IS ORDERED that each side submit a status report, on or before March 6, 1998, stating whether it believes that case to still be at issue and, if so, identifying all legal questions requiring judicial determination. Plaintiff is urged to consider his position carefully, as further prosecution of what may prove to be a legally or factually frivolous claim may subject him or his counsel to sanctions including the assessment of costs and/or attorney fees.

---

**9.** I note that in *Shaw,* the statute at issue specifically directed the surveyor general of the New Mexico territory to survey and locate the land selected by the grantees in settlement of their claims. 170 U.S. at 342–43, 18 S.Ct. at 644–45.